# In the
# United States Court of Appeals
## for the Seventh Circuit

ACHERON MEDICAL SUPPLY, LLC,

*Plaintiff-Appellant/*
*Cross-Appellee,*

v.

COOK MEDICAL INCORPORATED, et al.,

*Defendants-Appellees/*
*Cross-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division, No. 1:15-cv-01510-WTL-DLP.
The Honorable **William T. Lawrence**, Judge Presiding.

## BRIEF AND APPENDIX OF PLAINTIFF-APPELLANT
## ACHERON MEDICAL SUPPLY, LLC

IRVING M. GESLEWITZ
MUCH SHELIST, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-2000
(312) 521-2414

BRADLEY J. WOMBLES
NORRIS CHOPLIN SCHROEDER LLP
101 West Ohio Street
Ninth Floor
Indianapolis, Indiana 46204-4213
(317) 269-9330

*Counsel for Appellant*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-2315 & 19-2410

Short Caption: Acheron Medical Supply, LLC v. Cook Medical Incorporated, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Acheron Medical Supply, LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Much Shelist, P.C.

Norris Choplin Schroeder LLP

(3) If the party or amicus is a corporation:

   i) Identify all its parent corporations, if any; and

   N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   N/A

Attorney's Signature: s/Irving M. Geslewitz          Date: July 30, 2019

Attorney's Printed Name: Irving M. Geslewitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☒   **No** _____

Address: Much Shelist, P.C., 191 N. Wacker Drive, Ste. 1800

Chicago, Illinois 60606

Phone Number: 312-521-2414          Fax Number: 312-521-2100

E-Mail Address: igeslewitz@muchlaw.com

rev. 01/15 GA

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 19-2315 & 19-2410

Short Caption: Acheron Medical Supply, LLC v. Cook Medical Incorporated, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [   ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Acheron Medical Supply, LLC

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Much Shelist, P.C.

Norris Choplin Schroeder LLP

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Bradley J. Wombles          Date: September 12, 2019

Attorney's Printed Name: Bradley J. Wombles

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address: NORRIS CHOPLIN SCHROEDER LLP, 101 West Ohio Street, Ninth Floor

Indianapolis, IN 46204

Phone Number: 317-269-9330          Fax Number: 317-269-9338

E-Mail Address: bwombles@ncs-law.com

rev. 01/15 GA

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ........................................................ i

TABLE OF AUTHORITIES ............................................................................................ v

JURISDICTIONAL STATEMENT ................................................................................. 1

    I.   Jurisdiction of the District Court ...................................................................... 1

        A.  Plaintiff's Citizenship: ................................................................................ 1

        B.  Defendants' Citizenship: ............................................................................. 1

        C.  Amount in Controversy: ............................................................................. 2

    II.   Jurisdiction of the Court of Appeals ................................................................ 2

ISSUES PRESENTED FOR REVIEW ........................................................................... 3

STATEMENT OF THE CASE ......................................................................................... 4

    I.   Statement of Facts ............................................................................................. 5

        A.  The Distribution Agreement ....................................................................... 5

        B.  The FSS and Its Processing ......................................................................... 8

        C.  The VA OIG's August 14, 2014 Letter ....................................................... 12

        D.  The VA's No Award Letter .......................................................................... 14

        E.  Cook Medical Reverses Course and Commits to Cooperating
            With the OIG .............................................................................................. 15

        F.  Cook Medical Prevents Acheron From Making Any DAPA Sales ............... 17

        G.  Cook Medical Terminates the Agreement .................................................. 18

SUMMARY OF ARGUMENT ....................................................................................... 19

STANDARD OF REVIEW ............................................................................................. 23

ARGUMENT ................................................................................................................. 23

    I.  By Preventing Acheron From Satisfying a Regulatory Requirement
      Necessary to Obtaining an FSS Contract, Cook Medical Breached Its
      Implied Good Faith Duty of Cooperation. .................................................... 23

A. The District Court Erred in Concluding that the Agreement's Silence on the Subject of Cook Medical Cooperating with the OIG Information Request Meant No Such Duty Could Be Implied.................... 23

B. The District Court Erred in Concluding that the Prevention Doctrine Did Not Excuse Acheron's Inability to Obtain an FSS Contract. ......................... 34

C. The District Court Erred by Refusing to Read the Agreement's Force Majeure Clause as Requiring Cook Medical to Cooperate in Eliminating the Cause That Was Preventing Obtaining an FSS Contract. ......... 39

D. Section 515.408(b)(5) Was an Implied Term of the Agreement; Once Acheron Obtained Cook Medical's Authorization for VA Access to Its Sales Records, It Fulfilled that Term and Cook Medical Could Not Terminate the Agreement for Not Obtaining an FSS Contract. ....... 42

E. The District Court's Basis for Rejecting Acheron's Election of Remedies Argument Was Factually Wrong. ......................................................................... 44

II. The District Court's Decision that the Agreement Did Not Evince an Intent to Give Acheron the Exclusive Right to Sell Cook Medical's Endoscopy Products to the DOD Was Contrary to the Facts of Record............. 47

CONCLUSION ............................................................................................................ 50

iv

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Allapattah Servs., Inc. v. Exxon Corp.*,
  61 F. Supp. 2d 1300 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003),
  *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546
  (2005) ...................................................................................................................26

*Allen v. Clarian Health Partners, Inc.*,
  980 N.E.2d 306 (Ind. 2012)................................................................................33

*AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*,
  896 F.2d 1035 (7th Cir. 1990) ............................................................................30

*Barefield v. Vill. of Winnetka*,
  81 F.3d 704 (7th Cir. 1996) ................................................................................23

*Beanstalk Grp., Inc. v. AM Gen. Corp.*,
  283 F.3d 856 (7th Cir. 2002) ..............................................................................33

*Bigda v. Fischbach Corp.*,
  898 F.Supp. 1004 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996)...............................44

*Biomet Inc. v. TACT Med. Instruments Inc.*,
  No. 3:01 CV 895, 2005 WL 1563429 (N.D. Ind. June 30, 2005), *aff'd*, 454
  F.3d 653 (7th Cir. 2006) .....................................................................................29

*City of Indianapolis v. Twin Lakes Enters., Inc.*,
  568 N.E.2d 1073 (Ind. Ct. App. 1991) ...............................................................46

*Coleman v. Chapman*,
220 N.E.2d 285, 288 (Ind. Ct. App. 1966) ............................................................33

*Courtesy Enters., Inc. v. Richards Labs.*,
  457 N.E.2d 572 (Ind. Ct. App. 1983) .................................................................28

*Denius v. Dunlap*,
  330 F.3d. 919 (7th Cir. 2003) ................................................................................8

*Echo, Inc. v. Whitson Co., Inc.*,
  121 F.3d 1099 (7th Cir. 1997)..............................................................................25

*Ethyl Corp. v. Forcum-Lannom Assoc's,*
433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982) .......................................................42

*G.L. Christian & Assocs. v. U.S.,*
312 F.2d 418 (Ct. Cl. 1963) ................................................................................42

*Hamlin v. Steward,*
622 N.E.2d 535 (Ind. Ct. App.1993) ...................................................................35

*Herremans v. Carrera Designs, Inc.,*
157 F.3d 1118 (7th Cir. 1998) .............................................................................35

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,*
908 F.2d 1351 (7th Cir. 1990) .............................................................................30

*Kipnis v. Mandel Metals, Inc.,*
318 Ill. App. 3d 498 (1st Dist. 2000).....................................................................33

*Lafayette Beverage Distribs., Inc. v. Anheuser–Busch, Inc.,*
545 F.Supp. 1137 (N.D. Ind. 1982).......................................................................46

*Luedtke Eng'g. Co. v. Ind. Limestone Co., Inc.,*
592 F. Supp. 75 (S.D. Ind. 1983), *aff'd sub nom.,* 740 F.2d 598 (7th Cir.
1984) .....................................................................................................................26

*Maddox v. Wright,*
489 N.E.2d 133 (Ind. Ct. App. 1986) ...................................................................34

*McArdle v. Peoria Sch. Dist. No. 150,*
705 F.3d 751 (7th Cir. 2013) ...............................................................................31

*Miller v. Geels,*
643 N.E.2d 922 (Ind. Ct. App. 1994) ...................................................................42

*Mkt. St. Assocs. Ltd. P'ship. v. Frey,*
941 F.2d 588 (7th Cir. 1991) .........................................................................30, 34

*Ogle v. Wright,*
360 N.E.2d 240 (Ind. Ct. App. 1977) ...................................................................46

*Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,*
970 F.2d 273 (7th Cir. 1992) ...............................................................................30

*Osman v. Ford Motor Co.*,
359 Ill. App. 3d 367 (4th Dist. 2005) ...................................................................32

*Rhode Island Charities Tr. V. Engelhard Corp.*,
267 F.3d 3,7 (1st Cir. 2001) ....................................................................................34

*Rogier v. Am. Testing & Eng'g Corp.*,
734 N.E.2d 606 (Ind. Ct. App. 2000) ..............................................................34, 39

*Rousonelos v. Leach*,
2013 IL App (4th) 130268-U ...................................................................................32

*Sally Beauty Co., Inc. v. Nexxus Prod. Co.*,
801 F.2d 1001 (7th Cir. 1986) .................................................................................24

*Saverslak v. Davis–Cleaver Produce Co.*,
606 F.2d 208 (7th Cir. 1979) ...................................................................................46

*Spircoff v. Spircoff*,
74 Ill. App. 3d 119 (1st Dist. 1979) .........................................................................32

*Stephenson v. Frazier*,
399 N.E.2d 794 (Ind. Ct. App. 1980) .....................................................................34

*Stutz v. Minn. Min. Mfg. Co.*,
947 F. Supp. 399 (S.D. Ind. 1996) ..........................................................................24

*UPMC Braddock v. Harris*,
934 F.Supp. 2d 238 (D.D.C. 2013) vacated on other grounds and appeal
dismissed *sub nom, UPMC Braddock v. Perez*,
584 Fed. Appx. 1 (D.C. Cir. 2014).....................................................................42, 43

*Vanadium Corp. of Am. v. Fid. & Deposit Co. of Md.*,
159 F.2d 105 (2d Cir. 1947) ....................................................................................39

*Voyles v. Sandia Mort. Corp.*,
196 Ill. 2d 288 (2001)...............................................................................................32

*Warrick Beverage Corp. v. Miller Brewing Co.*,
352 N.E.2d 496 (Ind. Ct. App. 1976) .....................................................................26

*Whitt v. Godwin*,
139 S.E.2d 841 (Va. 1965) .......................................................................................37

*Wilson v. Career Educ. Corp.,*
729 F.3d 665 (7th Cir. 2013) (concurring opinion) .............................................31

*Wis. Elec. Power Co. v. Union Pac. R. Co.,*
557 F.3d 504 (7th Cir. 2009) ...........................................................................40

*Wood v. Lucy, Lady Duff-Gordon,*
118 N.E. 214 (N.Y. 1917) ...........................................................................26, 27

**Statutes**

28 U.S.C. § 1291 ...............................................................................................3

28 U.S.C. § 1332 ...........................................................................................1, 2

Ind. Code § 26–1–1–201(3) ...............................................................................26

Ind. Code § 26–1–1–201(11) .............................................................................26

Ind. Code § 26-1-1-203 ................................................................................24, 29

Ind. Code § 26-1-2-103(1)(b) ............................................................................24

Ind. Code § 26-1-2-202 ....................................................................................26

Ind. Code § 26-1-2-202(a) & Comment................................................................25

Uniform Commercial Code § 2-202.....................................................................25

**Other Authorities**

2A C.J.S. Agency § 325 .....................................................................................48

5 Williston on Contracts § 684 (Rev. ed. 1961) ....................................................44

6 Williston on Contracts § 887 (3d ed. 1962) .......................................................38

6 Peter Linzer, Corbin on Contracts § 26.15 (Joseph M. Perillo, ed., 2010)........................31

13 Williston on Contracts § 39:11 (4th ed.) .........................................................37

48 C.F.R. § 8.405-3 ...........................................................................................7

48 C.F.R. § 8.405-5 ...........................................................................................8

48 C.F.R. § 16.504(a) ..................................................................................................7

48 C.F.R. § 19.201 ......................................................................................................8

48 C.F.R. § 515.408 ....................................................................................................9

48 C.F.R. § 515.408(b)(5) ............................................................................ *passim*

48 C.F.R. § 538.271(b) ...............................................................................................9

About the Office of Contract Review—U.S. Dep't of Veterans Affairs,
Office of Inspector General, https://www.va.gov/oig/about/contract-
review.asp (last visited Sept. 23, 2016) .................................................................12

Fed. R. App. P. 3 and 4 ..............................................................................................3

Office of Procurement, Acquisition and Logistics,
https://www.va.gov/opal/nac/fss/gettingOnSchedule.asp (last visited
Sept. 23, 2016) ...........................................................................................................9

Restatement (First) of Contracts, § 309 (1932) ........................................................44

Restatement (Second) of Contracts § 205 cmt. d (1981) ..........................................31

Restatement (Second) of Contracts § 245 (1981) .....................................................36

Restatement (Second) of Contracts § 245, cmt. a, illus. 4 (1981) ...........................38

VA Federal Supply Schedule Service, https://www.fss.va.gov. (last visited
Aug. 3, 2019) .............................................................................................................8

VA's Office of Procurement, Acquisition and Logistics (OPAL)
https://www.va.gov/opal/nac/fss/oig.asp (last visited Sept. 23, 2016) .............12

# JURISDICTIONAL STATEMENT

## I. Jurisdiction of the District Court

The district court had jurisdiction of this action pursuant to 28 U.S.C. § 1332 because it is an action between citizens of different states and the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

### A. Plaintiff's Citizenship:

Acheron Medical Supply, LLC ("Acheron") is a limited liability company organized under the laws of Texas with a principal place of business in Batavia, Ohio. The members of Acheron are SHFHG LLC, a limited liability company organized under the laws of Texas with its principal place of business in Texas, and Lauch Medical LLC, a limited liability company organized under the laws of Ohio with its principal place of business in Ohio. The sole member of SHFHG LLC is John Wesley Pate, a citizen of Texas at the time of the filing of the underlying Complaint and now a citizen of Florida. The members of Lauch Medical LLC are Frank D. Lauch and Louis H. Lauch, both of whom are citizens of Ohio.

### B. Defendants' Citizenship:

Cook Medical LLC: On January 28, 2016, the parties submitted their Joint Supplemental Jurisdictional Statement in the district court (Doc. No. 29), which provided the following information regarding Cook Medical LLC's state of domicile:

1. Cook Medical LLC is a limited liability company organized under the laws of Indiana with its principal place of business in Bloomington,

Indiana.

2. The sole member of Cook Medical LLC is Cook Group, Inc. Cook Group, Inc., is a corporation organized under the laws of Indiana with its principal place of business in Bloomington, Indiana. Cook Group, Inc., the sole member of Cook Medical LLC, is thus a citizen of Indiana.

3. Cook Medical LLC, through the citizenship of its sole member, is a citizen of Indiana.

Cook Medical Incorporated: Cook Medical LLC was previously known as Cook Medical Incorporated. Cook Medical Incorporated was an Indiana corporation with its principal place of business in Bloomington, Indiana. On or about January 1, 2014, Cook Medical Incorporated converted to Cook Medical LLC through Articles of Conversion filed with the Indiana Secretary of State.

## C. Amount in Controversy:

Acheron alleged in its Complaint that the defendants materially breached the contract with Acheron and that damages for the breach amount to well over $3 million.

Therefore, the district court had jurisdiction under 28 U.S.C. § 1332.

## II. Jurisdiction of the Court of Appeals

On June 24, 2019, the district court issued its Judgment stating as follows:

The Court having granted summary judgment in favor of the Defendants on the Plaintiff's claims, and, after a bench trial, having found in favor of the Counterclaim Defendant on the counterclaim, judgment is hereby **ENTERED** in favor of the Defendants on all claims of Plaintiff Acheron Medical Supply, LLC, and in favor of Counterclaim Defendant Acheron Medical Supply, LLC, on the counterclaim of Cook Medical LLC.

(Dkt. No. 149).

This is an appeal from a final judgment. This Court has jurisdiction under 28 U.S.C. § 1291, which grants the court of appeals with jurisdiction of appeals from all final decisions of the United States district courts, and under Fed. R. App. P. 3 and 4. On July 10, 2019, Acheron filed its Notice of Appeal (Dkt. No. 150), and hereby appeals from: (a) the district court's September 28, 2017 Entry on Motions for Summary Judgment (Dkt. No. 91), which was made a final and appealable order on June 24, 2019; and (b) that portion of the district court's Judgment in favor of the Defendants on all claims of Acheron. (Dkt. No. 149).

## ISSUES PRESENTED FOR REVIEW

1. The district court ruled on summary judgment that a seller (Cook Medical) could terminate its agreement with its reseller (Acheron) because Acheron did not obtain a Federal Supply Schedule contract, as specified by the agreement. The only reason that Acheron could not do so, however, was that Cook Medical prevented Acheron from satisfying a necessary regulatory requirement. Did the district court err in finding that Cook Medical had no good faith duty to cooperate because the agreement was silent in expressing such a duty?

2. The district court further ruled on summary judgment that Cook Medical did not breach the agreement when it prevented Acheron from making DOD sales by refusing to take a step necessary to enable Acheron to do so. Did the district court err?

# STATEMENT OF THE CASE

Plaintiff Acheron Medical Supply, LLC ("Acheron") filed this suit against Defendants Cook Medical Incorporated and Cook Medical LLC ("Cook Medical") for breach of contract.[1] The Complaint alleged that Cook Medical breached a Distribution Agreement ("Agreement") appointing Acheron as its exclusive and non-exclusive distributor (reseller) of its medical products to the Department of Defense ("DOD") and the Veterans Administration ("VA") by means of government purchase contracts, including a Federal Supply Schedule ("FSS") and a Distribution and Pricing Agreement ("DAPA"). Specifically, Acheron claimed that Cook Medical breached their Agreement by (i) refusing to cooperate with a verification review process required by the VA to obtain an FSS, and (ii) not deactivating Cook Medical's DAPA, which prevented Acheron from making any sales under Acheron's DAPA to the DOD. (Dkt. No. 1). With its answer, Cook Medical filed a counterclaim against Acheron for breach of contract for failing to obtain an FSS. (Dkt. No. 15).

Acheron filed a motion for partial summary judgment on the complaint and for summary judgment on the counterclaim (Dkt. No. 53), while Cook Medical filed a cross motion for partial summary judgment on the complaint. (Dkt. No. 56). The district court

---

[1] The written contract was signed by Cook Medical Incorporated, but the contract's preamble states that it was entered into by Cook Medical LLC (Dkt. No. 73-15). On or about January 1, 2014, before the execution date of the contract, Cook Medical Incorporated had been converted to Cook Medical LLC through Articles of Conversion filed with the Indiana Secretary of State. (Dkt. No. 161). Accordingly, all references herein to "Cook Medical" are to Cook Medical LLC.

granted Cook Medical's motion for summary judgment and denied Acheron's motion for summary judgment (Dkt. No. 91). Following a trial on the counterclaim, the district court entered judgment on the counterclaim for Acheron (Dkt. No. 148).

Acheron timely appealed from the district court's decision on the cross motions for summary judgment on the complaint. (Dkt. No. 150). Cook Medical then appealed from the district court's judgment on the counterclaim. (Dkt. No. 160).

## I.   Statement of Facts

This case is about a medical equipment seller entering into a long-term agreement with a reseller for the purpose of making sales to the VA and DOD and then declaring a breach and terminating the agreement after preventing the reseller from satisfying a necessary regulatory requirement to obtain an FSS contract to use to make sales to the VA.

### A.  The Distribution Agreement

On July 24, 2014, Cook Medical and Acheron executed a Distribution Agreement ("Agreement"), (Dkt. No. 73-4), memorializing a course of dealing that had commenced in the fall of 2013. (Dkt. No. 73-17, Pate Dep. at 56-57, 64-65).[2] The Agreement appointed

---

[2] References shall be made throughout this Brief to Acheron's Appendix of Evidence in support of its Opposition to Cook Medical's Motion for Partial Summary Judgment (Dkt. No. 68-1 to 68-16); to Acheron's Amended Appendix of Evidence in support of its own Motion for Partial Summary Judgment (Dkt. Nos. 73-1 to 73-17); and to Cook Medical's Appendix of Evidence in support of its Motion for Partial Summary Judgment (Dkt. No. 57-1 to 57-9). The most frequent references will be to the Agreement (Dkt. Nos. 68-3 and 73-4); the deposition of Acheron

Acheron to serve as a distributor (or reseller) of designated medical devices and products of Cook Medical to the DOD and the VA, denoted as the "Territory." (Article I, ¶¶ 1 and 2). Specifically, Acheron was appointed the *exclusive* distributor for the devices and products of Cook Medical's endoscopy business division (¶ 1) and a non-exclusive distributor for the devices and products of its other business divisions. (¶ 2).

The Agreement's term was five years. (Article IX, ¶ 1). Cook Medical could not terminate the Agreement unless it sent a written notice of the occurrence of a "material breach" by Acheron of any of Acheron's "essential contractual obligations" contained in the Agreement subject to cure within thirty days. (Article IX, ¶ 2).

Attached to the Agreement was a schedule, denominated as Exhibit A. (Dkt. No. 68-3 at 15). This schedule listed horizontally across the top by acronym various types of government contract vehicles (denoted as "contracted sales"). Listed vertically down the left-hand side were Cook Medical products classified by business division. Each column showed the commissions to be paid according to contract type and product (in most cases 8%). An asterisk next to each contract type denoted that these contracted sales were to be ordered directly through Acheron.[3]

The listed types of government contract vehicles were DAPA, FSS, BPA, and IDIQ. A DAPA (Distribution and Pricing Agreement) is a vehicle under which the

principal Wesley Pate (Dkt. Nos. 68-15 and 73-17); and the deposition of Cook Medical principal Ronald Walters (Dkt. Nos. 68-14 and 73-15).

[3] The last column, headed Direct Sales, will be discussed in Section II of the Argument.

DOD's Defense Logistics Agency ("DLA") accepts prices for the DAPA holder's products to be honored by DOD prime vendors. (Pate Dep. at 99-101). An FSS (Federal Supply Schedule) contract is a type of Multi-Award Schedule contract that the VA favors. (*Id.*; Walters Dep. at 184). A BPA (Blanket Purchase Agreement) is a contract that allows a government buyer to fill repetitive needs for denominated supplies. (*See* 48 C.F.R. § 8.405-3). An IDIQ (Indefinite Delivery, Indefinite Quantity) agreement is a type of contract that provides for an indefinite quantity of supplies during a fixed period of time. (*See* 48 C.F.R. § 16.504(a)).

The schedule reflected the basic purpose of the Agreement: As explained by Ronald Walters, the Cook Medical representative who served as liaison with Acheron, Cook Medical wanted to restructure its method of selling to the government by converting from its then current model of selling directly to the government through open market sales. The concept was to replace that with a model of government contract sales through a reseller holding contract vehicles such as a DAPA, an FSS, BPAs, and IDIQs. (Walters Dep. at 25-27, 228-29, 239-40; Dkt. No. 68-3 at 15). For various reasons, selling on the open market was costly and inefficient and did not fully exploit the VA and DOD markets. (Walters Dep. at 27; Dkt. No. 57-6). According to Walters, the intention of the Agreement was that after 2014 all endoscopy sales would be contracted sales through Acheron exclusively, and that Cook Medical would not compete with Acheron and would sell endoscopy products directly to a government

purchaser only in the limited instance where the purchaser was not solicited and chose to order directly from Cook Medical. (Walters Dep. 226-35).

Also, Cook Medical wanted to access the government's increasingly large set-aside for sales to Small Businesses, which had been increased from 24%–40% of its total sales. Partnering with Acheron would enable Cook Medical to take advantage of Acheron's status as a Small Business and its association with a Service-Disabled Veteran-Owned Small Business (SDVOSB) to access this set-aside market. (*See* 48 C.F.R. § 8.405-5, § 19.201); Dkt. No. 73-14 at 3; Dkt. No. 158, Day 1 Transcript of Trial at 62-65).

## B. The FSS and Its Processing

In the body of the Agreement, Article V, ¶ 2 referred to Acheron obtaining an FSS contract and using it to sell Cook Medical's products. (Dkt. No. 68-3 at 6). An FSS is the VA's favored government contract vehicle. (Walters Dep. at 28-29). An FSS benefits the contract holder because the VA lists the FSS holder's products in a national schedule at pre-set prices based on a commercial "most favored customer" pricing concept, which is available to all regional or local VA purchasers. Those local purchasers may in turn negotiate a lower price based on a volume commitment. (*See* VA Federal Supply Schedule Service, https://www.fss.va.gov. (last visited Aug. 3, 2019);[4] Walters Dep. at 27–30).

---

[4] Courts may take judicial notice of official government agency websites, *Denius v. Dunlap*, 330 F.3d. 919, 926–27 (7th Cir. 2003), and the district court appeared to have done so in its decision, although without specific attribution.

The process for obtaining an FSS contract is governed by various rules and regulations, chief among them Title 48 of the Code of Federal Regulations (CFR) and the Federal Acquisition Regulations (FAR), specifically FAR Subpart 8.4 and FAR Part 38. These regulations require the use of a Commercial Sales Practices (CSP) format, as prescribed by 48 C.F.R. § 515.408, designed to obtain sufficient data so that the assigned government contracting officer can perform a price analysis, determine price reasonableness, and develop objectives for negotiations with respect to the FSS offeror's proposed pricing.

The process can take up to a year, commencing with the submission of a solicitation with suggested pricing. That is followed by the eventual assignment of a contract specialist in the VA's Office of Acquisition, Logistics and Construction who reviews the proposal and seeks additional necessary pricing information, followed by full review and price analysis, followed in turn by negotiations over the proposed pricing, then notification of award, and finally entry into a multi-year FSS contract. The VA's goal is to confirm that it is obtaining pricing that is "fair and reasonable", but not necessarily the best price. (48 C.F.R. § 538.271(b); *see also* Office of Procurement, Acquisition and Logistics, https://www.va.gov/opal/nac/fss/gettingOnSchedule.asp (last visited Sept. 23, 2016); Pate Dep. at 64–66).

Acheron principal Wesley Pate testified that Acheron submitted its FSS solicitation to the VA in November of 2013, shortly after the parties began their

relationship and before the eventual execution of the Agreement, proposing 1,384 Cook Medical endoscopy products for placement on the FSS. (Dkt. Nos. 73-9 and 73-14; Pate Dep. at 64–65). By the time the Agreement was finally executed on July 24, 2014, the contract specialist's review of the FSS solicitation was nearing the stage where the next step was for the VA to seek verification of all pricing information submitted by Acheron in order to perform a full review and price analysis and then negotiate fair and reasonable pricing. (Pate Dep. at 178).

As part of that pricing verification process, it was necessary for Cook Medical, as the manufacturer of the products Acheron was representing, to allow the VA access to its sales records in order for the VA to confirm that the offered pricing was fair and reasonable and not, for example, marked up via the conduit of a reseller. Thus, according to 48 C.F.R. § 515.408(b)(5), if the applicant is a reseller "without significant sales to the general public"—such as Acheron—then the manufacturer's sales information must be provided "if the manufacturer's sales under any resulting contract are expected to exceed $500,000."[5] (*See also* VA's Office of Procurement, Acquisition,

---

[5] 48 C.F.R. § 515.408(b)(5) states in relevant part as follows:

If you are a dealer/reseller without significant sales to the general public, you should provide manufacturers' information required by paragraphs (1) through (4) above for each item/SIN offered, if the manufacturer's sales under any resulting contract are expected to exceed $500,000. You must also obtain written authorization from the manufacturer(s) for Government access, at any time before award or before agreeing to a modification, to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer. The information is required in order to enable the Government to make a

and Logistics, https://www.va.gov/opal/business/fss/csp.asp. (last visited Sept. 23, 2016)).

Walters was aware that Acheron was a recent start-up company and did not yet have significant sales to the general public. (Walter Dep. at 50-51). He was also aware that the sales under the resulting FSS contract were expected to exceed $500,000. (*Id*.). Thus, he conceded that under the regulations as worded, for Acheron to obtain an FSS contract, Cook Medical would have to allow the VA access to its pricing information. (Walters Dep. at 254).

As noted above, the regulations directed Acheron, as reseller, to obtain "written authorization from the manufacturer(s) for Government access, at any time before award . . . to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer." 48 C.F.R. § 515.408(b)(5). Acheron informed Cook Medical of this requirement and requested and *did* obtain such a written authorization from Cook Medical (hereafter "Letter of Authorization") (Dkt. No. 73-7; Walters Dep. at 189, 193; Pate Dep. at 176–78).[6]

---

determination that the offered price is fair and reasonable. To expedite the review and processing of offers, you should advise the manufacturer(s) of this requirement . . . .

[6] The Letter of Authorization, dated June 10, 2014 and signed by Walters, read as follows:

Cook Medical, LLC agrees to provide to the Veterans Administration those sales records between Cook and Acheron, our contracted vendor for medical devices purchased by VA Medical Centers, *and all other needed records* to support this contract award. The sole purpose of providing access to this information will be to verify information submitted by

A VA contracting specialist can request the involvement of the VA's Office of Inspector General (OIG) in reviewing an FSS proposal in pre-award, post-award, and other reviews of FSS proposals and contracts. *See* About the Office of Contract Review—U.S. Dep't of Veterans Affairs, Office of Inspector General, https://www.va.gov/oig/about/contract-review.asp (last visited Sept. 23, 2016). The VA OIG's involvement is standard where, as here, a new solicitation proposal with an estimated value of $500,000 or more is made by a reseller that lacks significant commercial sales and who will be representing the manufacturer's information. *See* VA's Office of Procurement, Acquisition and Logistics (OPAL) https://www.va.gov/opal/nac/fss/oig.asp (last visited Sept. 23, 2016) (reproduced at Dkt. No. 57-7). Walters admitted that Pate informed him in an email on June 2, 2014—*prior to the execution of the Agreement*—that the matter "will be submitted to the OIG for pre-award verification." (Walters Dep. 170–71).

### C. The VA OIG's August 14, 2014 Letter

On August 14, 2014, about three weeks after the execution of the Agreement, the VA OIG sent a letter to Walters asking Cook Medical to submit certain information as part of its pre-award review of the proposal submitted by Acheron and the proposed

---

the Dealer/Reseller (Acheron Medical Supply) to the Veterans Administration. (Emphasis supplied).

(Dkt. No. 73-7). Walters testified that when he signed this letter he understood that he was authorizing the VA to see all needed records to support a contract award. (Walters Dep. at 193).

items manufactured by Cook Medical. (Dkt. No. 73-8).

The letter stated that its objective was to determine: (i) if the CSPs and supporting data were accurate and complete; (ii) whether offered prices were equal to or better than those offered to the manufacturer's most favored customers; (iii) those customers who received discounts better than those offered to the Government and the yearly volume or other consideration upon which those discounts were based; (iv) the accuracy of information provided by Cook Medical and Acheron related to any rebate or incentive-type programs; and (v) the identity of those customers who could serve as an appropriate tracking customer under the Price Reduction Clause. A list of eleven items of information was attached as Enclosure A to the letter. The letter assured Cook Medical that the confidentiality of the information submitted would be maintained. (*Id*.).

Notwithstanding that it previously had agreed to provide the VA access to such information pursuant to its Letter of Authorization, Cook Medical now refused to supply the information requested purportedly because it did not anticipate there would be an OIG audit. (Walters Dep. at 157, 278; Dkt. No. 73-15). Walters acknowledged being aware, however, that the VA, in acting on the FSS application, had an obligation to determine if the offered pricing was fair and reasonable and understood that Cook Medical's customer sales information had to be submitted in order for the VA to do so. Walters further was aware that as long as Cook Medical would not provide the

commercial pricing information requested by the VA OIG, Acheron would not be able to obtain an FSS contract unless, in his words, Acheron somehow "figured out an alternative way to do it." (Walters Dep. at 172–73, 334–35).

### D. The VA's No Award Letter

Acheron attempted to determine if it could work with the VA to try to accommodate Cook Medical's refusal to cooperate with the OIG request, but was unable to do so. (Walters Dep. 278-80; Pate Dep. 195-96). Accordingly, on December 28, 2014, the VA issued a provisional "no award" letter on Acheron's FSS solicitation, stating as its reason "the non-receipt of required information to the OIG for review." (Dkt. No. 68-6).

The letter noted that "Acheron did provide the signed authorization letter from Cook on June 2014 stating that the manufacturer would provide Government access to its confidential sales data." (*Id.*) The letter further noted Acheron's efforts to provide limited information outside of the OIG request. (*Id.*). However, the VA determined this was insufficient and concluded:

> Acheron and Cook have been unwilling to provide a complete response to the information that was requested by the OIG. The requested data is required to review sales data, discounts, evaluate business practices, establish a basis for negotiations, and facilitate a (subsequent) fair and reasonable price determination. It is noted that, to date, Acheron and/or Cook have not provided the complete, required information to the OIG for review. Therefore due to lack of information and non-receipt of required information in accordance with CSP-Commercial Sales Practices Format, Point (5), this proposal package is a "no award" until that information is provided for review of this award.

(*Id*.).

Although the letter referred to both Acheron and Cook Medical not providing the complete required information, as explained above the only way Acheron could get the information *was with Cook Medical's cooperation*. Indeed, Walters expressly acknowledged that Acheron could not do so because Cook Medical refused to cooperate. (Walters Dep. at 336–37).

### E. Cook Medical Reverses Course and Commits to Cooperating With the OIG

After learning of the no award letter, Walters sent an email to his superior, David Breedlove, advising that Cook Medical "will need to provide the OIG access to all Cook Medical Endoscopy pricing for their review and determination of what is fair and reasonable." (Dkt. No. 73-11). He further advised that although cooperating with the OIG request would likely result in Tier 1 GPO pricing for the FSS, this was actually "good news" because Cook Medical's existing pricing was "already at or below this level now." (*Id*.). After obtaining Breedlove's approval to proceed with OIG review, Walters instructed Pate "we are good to go" and that he should resubmit the FSS application to the VA OIG. (Dkt. No. 68-7; Walters Dep. at 344–346). Pate then did so. (Pate Dep. at 226–28).

Walters also sent two emails to officials of the VA—dated January 27, 2015 and February 27, 2015, respectively—informing them of Cook Medical's willingness to

cooperate with the OIG review. (Dkt. Nos. 68-11, 68-12; Walters Dep. at 377–378). In one email he told a VA official "[w]e are fine with doing the audit and would just like to get our products on an FSS contract." (Dkt. No. 68-11), while in the other he reiterated to another VA official that "[w]e at Cook Medical are fine with completing the OIG audit at this point." (Dkt. No. 68-12). In addition, Walters exchanged emails internally with staff with instructions on assembling the information for the OIG audit, (Dkt. No. 68-9), and sent emails to prime vendors as well informing them of Cook Medical's submission to the OIG's requirement of a review of its commercial pricing. (Dkt. No. 68-10; Walters Dep. 374–76).

On or about March 23, 2015, however, in a complete about face, Walters informed Acheron that Cook Medical had decided not to proceed with the OIG request for pricing information after all. At the same time, he told Acheron that he considered the Agreement as nonetheless still being in place for other opportunities such as BPAs and IDIQs and other forms of business with the VA. (Walter Dep. at 381–83, 408–410).

After Pate sent an email suggesting exchanging out Cook Medical's products to another vendor as a means of salvaging the FSS process, Walters responded by email on April 6, 2015, telling Acheron that Cook Medical's interest in continuing to work with Acheron in getting an FSS was now "doubtful at best for the near term." (Dkt. No. 68-13 at 4). He also advised that the DOD portion of the business was "out of play", as Cook Medical would be using its own DAPA. (*Id*.) He reiterated, however, that he considered

the Agreement as still in place. (*Id*.)

### F. Cook Medical Prevents Acheron From Making Any DAPA Sales

Walters' pronouncement that the DOD portion of Cook Medical's business was "out of play" was simply acknowledging the course Cook Medical already had followed since the Agreement had been executed. Thus, despite the Agreement's designation of DAPA contracted sales as being "ordered directly through Acheron," (Dkt. No. 68-3 at 15), and naming Acheron as exclusive distributor to the DOD, (*Id*. at 2), Cook Medical had prevented Acheron from making *any* DAPA sales of its products. All DOD DAPA sales were made directly by Cook Medical without the need to pay a commission to Acheron. (Walters Dep. at 128; Pate Dep. at 184).

The reason Acheron could not sell through its DAPA was because Cook Medical had never deactivated its own DAPA. By arrangement of the parties, in the fall of 2013, well before the Agreement was signed, Acheron had downloaded Cook Medical's endoscopy products onto its own DAPA using Cook Medical's pricing and had then obtained the DOD DLA's approval of those products on its DAPA. (Pate Dep. at 56–57). Acheron had also listed the DAPA pricing as the proposed price point in its FSS application to the VA, with the strategy being that when the time eventually came for negotiating the FSS pricing with the VA, Acheron would by then have a history of selling Cook Medical products to justify the proposed pricing. (Pate Dep. at 100–05;

Walters Dep. at 96). However, for Acheron to use its DAPA to make *any* DOD sales, Cook Medical had to deactivate its own DAPA, as a manufacturer's products can only be listed on one DAPA. (Walters Dep. 96, 141–46; Pate Dep. 94–96, 99–101, 107–08).

Despite Acheron being the exclusive distributor for endoscopy sales, Cook Medical ultimately never deactivated its DAPA and Acheron was never able to make any DAPA sales to the DOD. (Walters Dep. at 128, 311). Walters explained that he decided not to deactivate Cook Medical's DAPA shortly after receiving the August 14, 2014 OIG letter, and that it was "simply a business decision" precipitated by that letter. (Walters Dep. at 308–11, 407–08).

## G. Cook Medical Terminates the Agreement

On April 14, 2015, Acheron principal Frank Lauch sent a detailed email response to Walters' April 6, 2015 email, protesting Cook Medical's actions. (Dkt. No. 68-13 at 2–5). In his response, Lauch recounted the purpose of the relationship being that Acheron would serve as Cook Medical's Small Business and SBDVO partner; the parties' course of dealings in the lead-up to the Agreement, including the time and effort Acheron had expended in visiting with the various prime vendors and government procurement personnel and invested in pursuing the FSS and DAPA processes; how Cook Medical had failed to proceed in good faith by not cooperating with the OIG review, then agreeing to cooperate, and then changing its mind again; and how Cook Medical had

dishonored the Agreement in regard to the DAPA. (*Id.*). Walters forwarded that email to a superior at Cook Medical on the same date, observing, *inter alia*, that some of Lauch's comments led him to believe that Acheron "may try to enforce the Agreement on us." (*Id.* at 2).

On July 1, 2015, Cook Medical issued Acheron a thirty-day notice to cure, stating that Acheron was "in material breach of the following essential contractual obligations":

1) Inability to obtain a Federal Supply Schedule contract and use it to sell the Endoscopy products.

2) Inability to provide Cook access to a Federal Supply Schedule contract for Endoscopy products at pricing that it acceptable to Cook.

3) Failure to use its best efforts to promote, solicit and expand the sale of the Products within the Territory.

(Dkt. No. 15-2). Cook Medical terminated the Agreement on July 31, 2015, based on Acheron's purported failure to cure. (*Id.*).

Acheron then brought suit alleging that Cook Medical breached the Agreement by improperly terminating it for failure to obtain the FSS contract that Cook Medical itself prevented Acheron from doing by refusing to cooperate with the VA information request, and by preventing Acheron from making any DAPA sales as Cook Medical's reseller to the DOD by refusing to deactivate its own DAPA.

## SUMMARY OF ARGUMENT

It was undisputed below that under the requirements of 48 C.F.R. § 515.408(b)(5) Cook Medical had to provide the OIG with pricing verification in order for Acheron to

be able to obtain an FSS contract. It was also undisputed that Cook Medical provided that assurance to the VA at least three times: first when it signed the Letter of Authorization required by that regulation and then later two more times in emails to VA officials. Yet despite these facts, the district court entered summary judgment for Cook Medical and denied Acheron's cross motion on the basis that nothing in the Agreement required Cook Medical to "reasonably respond to requests for information [from the VA] or otherwise undertake any action in aid of Acheron fulfilling its duty and obligation to obtain an FSS contract."

This was error. The district court's mode of analysis was at odds with the principle that contracts, and particularly ones governed by the Indiana Commercial Code, impose an obligation of good faith in their performance or enforcement, inclusive of observance of reasonable commercial standards of fair dealing in the trade, whether or not such a duty to cooperate is expressly stated in the operative agreement. Contrary to the district court's analysis, the fact that a UCC contract may be silent on a duty does not foreclose the implication of such a duty. Reading such a good faith and fair dealing duty into the Agreement required Cook Medical to have cooperated with the OIG request for information needed to evaluate the FSS application, for without such cooperation Acheron could never obtain an FSS contract.

The district court further erred in similarly refusing to apply the related equitable prevention doctrine that bars a party who prevents the other party's performance from

20

standing on that non-performance to declare a breach of contract. The present facts effectively demonstrate this principle, as Cook Medical's refusal to cooperate with the VA's information request frustrated the purpose of the Agreement by making it impossible for Acheron to perform, and thereby denied Acheron the benefit of its bargain. Cook Medical was thus barred from terminating the Agreement and breached the Agreement when it did.

The district court further erred in its narrow reading of the Agreement's "force majeure" clause, which excused any default due to "an act of government or . . . [government] agency." The district court read this provision as solely applying to Acheron such that it did not impose any duty on Cook Medical to eliminate the cause that was preventing obtaining an FSS contract, even though it was exclusively in its control to do so. But when this provision is more properly read in light of the purpose of the Agreement and commercial reasonableness in a UCC contract, it required Cook Medical as well as Acheron to make "every reasonable effort" to eliminate the cause preventing performance.

To the same effect, Indiana law holds that statutes or regulations in effect at the time of entry into an agreement impliedly form a part of that agreement. The district court therefore should have read 48 C.F.R. § 515.408(b)(5) into the Agreement. The district court determined that doing so, however, would not have changed the fact that it was Acheron's obligation to comply with that regulation, and not Cook Medical's. But

Acheron *did* comply with that regulation by obtaining the Letter of Authorization from Cook Medical authorizing the VA access to its pricing information. It was Cook Medical's *dishonoring* of its own Letter of Authorization that was the proximate cause of Acheron's inability to obtain an FSS contract.

Furthermore, when Cook Medical elected to continue the Agreement after it determined that Acheron had failed to obtain an FSS contract, it was barred from later terminating the Agreement on that same basis under the "election of remedies" doctrine, as well as principles of waiver, estoppel, and modification. The district court's determination that there was nothing left for Acheron to do once it was unable to obtain an FSS contract was simply contrary to the facts of record.

Finally, Cook Medical separately breached the Agreement by not deactivating its own DAPA. Because the same products cannot be on more than one DAPA, Cook Medical thereby prevented Acheron from making *any* sales of Cook Medical's endoscopy products to the DOD through its own DAPA, despite Acheron's designation as exclusive distributor of DAPA endoscopy sales to the DOD. The district court found that the Agreement allowed Cook Medical to make direct sales and that Acheron was not even entitled to any commissions at all until after the date Acheron obtained an FSS contract. But that finding was contrary to Walters' testimony explaining the very limited circumstances in which the Agreement was intended to allow direct sales by Cook Medical.

This Court should therefore reverse the summary judgment in favor of Cook Medical, direct entry of summary judgment in Acheron's favor on the complaint, and remand the case to determine Acheron's damages.

## STANDARD OF REVIEW

On cross motions for summary judgment, the standard for review is *de novo*, resolving all reasonable inferences in favor of the non-moving party. *Barefield v. Vill. of Winnetka,* 81 F.3d 704, 708 (7th Cir. 1996).

## ARGUMENT

**I. By Preventing Acheron From Satisfying a Regulatory Requirement Necessary to Obtaining an FSS Contract, Cook Medical Breached Its Implied Good Faith Duty of Cooperation.**

**A. The District Court Erred in Concluding that the Agreement's Silence on the Subject of Cook Medical Cooperating with the OIG Information Request Meant No Such Duty Could Be Implied.**

In its decision on the cross motions for summary judgment, the district court duly noted most of the undisputed facts of record as set forth in the foregoing Statement of the Case, including the necessity that Cook Medical had to provide the OIG with pricing verification in order for Acheron to be able to obtain an FSS contract. (A-2–9). But the district court found those facts to be irrelevant because it could not find any language in the Agreement stating that Cook Medical had an obligation to

cooperate and provide its pricing information to the OIG, even though Cook Medical knew that Acheron could not satisfy the audit without such information which was in Cook Medical's exclusive control. (A-15–17). The district court concluded that because the requirement that Acheron obtain an FSS contract was not qualified by an express obligation that Cook Medical submit to an OIG audit, no such obligation could be read into the Agreement. *(A-15)*. It therefore effectively agreed with Cook Medical's argument that nothing in the Agreement required Cook Medical to "reasonably respond to requests for information [from the VA] or otherwise undertake any action in aid of Acheron fulfilling its duty and obligation to obtain an FSS contract." (A-16).

In making its ruling, the district court gave short shrift to the Indiana Commercial Code ("ICC"),[7] which provides that every contract governed by the ICC "imposes an obligation of good faith in its performance or enforcement," Ind. Code § 26-1-1-203, and defines "good faith" as "honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." Ind. Code § 26-1-2-103(1)(b).[8]

---

[7] The Agreement provides that Indiana law governs all matters arising out or related to the Agreement. (Dkt. No. 73-4, Article 7.a.).

[8] A distribution agreement for the sale of goods, such as the Agreement at issue, is governed by the UCC. *See Sally Beauty Co., Inc. v. Nexxus Prod. Co.*, 801 F.2d 1001, 1005–06 (7th Cir. 1986) (surveying UCC cases and noting that virtually every jurisdiction that has addressed this issue has concluded that the UCC generally applies to distributorship agreements). *See also Stutz v. Minn. Min. Mfg. Co.*, 947 F. Supp. 399, 402 (S.D. Ind. 1996). Neither the parties nor the district court contested that the Agreement is governed by the UCC.

Reading such a good faith and fair dealing duty into the Agreement required Cook Medical to have cooperated with the OIG request for information needed to evaluate the FSS application. Obviously, without such cooperation, Acheron could never obtain an FSS contract.

The district court, however, found that the ICC was of no avail to Acheron because the Comment to Uniform Commercial Code § 1-203 states the good faith obligation applies to "a specific duty or obligation under the contract" and does not create a duty where none purportedly exists. (A-15). The district court reasoned that since the Agreement did not expressly impose a duty on Cook Medical to cooperate with an OIG audit or to assist Acheron in obtaining an FSS contract, no such obligation could be inferred by reason of the good faith obligation in the ICC. In the district court's words: "If the Agreement had imposed a duty on Cook to cooperate with the OIG audit, or assist Acheron in obtaining an FSS contract, then it would have had duty to do so in good faith. But no such obligation is placed on Cook by the Agreement." (A-16).

But this is not the proper mode of analysis for interpreting UCC contracts. Duties implied to make the contract work abound in the UCC. *See, e.g.*, Ind. Code § 26-1-2-202(a) & Comment to Uniform Commercial Code § 2-202. To that end, the UCC's provisions displace certain general principles of contract law, *Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1105 (7th Cir. 1997), including the notion that in determining the parties' intent, the court is confined to the four corners of the contract and that the

presence of an integration clause precludes implying duties not expressly stated. *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1300, 1307 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, (2005). Thus, Ind. Code § 26–1–1–201(11) defines "contract" as "the total legal obligation which results from the parties' *agreement* as affected by this Act and any other applicable rules of law". (emphasis added). "Agreement", in turn, "means the bargain of the parties in fact as found in their language *or by implication from other circumstances including course of dealing or . . . course of performance as provided in [Ind. Code.* §] *26–1–1– 205. . .* " Ind. Code § 26–1–1–201(3) (emphasis added); *Luedtke Eng'g. Co. v. Ind. Limestone Co., Inc.*, 592 F. Supp. 75, 79 (S.D. Ind. 1983), *aff'd sub nom.*, 740 F.2d 598 (7th Cir. 1984). Furthermore, under Ind. Code § 26-1-2-202, parol evidence addressing course of dealing should be considered not only in cases of ambiguity in a writing, but also in cases of *un*ambiguity unless the evidence to be presented contradicts the terms of the writing. *Warrick Beverage Corp. v. Miller Brewing Co.*, 352 N.E.2d 496, 501 (Ind. Ct. App. 1976).

While certainly one species of good faith and fair dealing involves the exercise of an expressed duty under a contract, the good faith obligation also applies, as Judge Cardozo elegantly put it in *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214 (N.Y. 1917) (quotations omitted), when an agreement that does not recite a particular duty is nonetheless "instinct with an obligation, imperfectly expressed." *Wood v. Lucy, Lady Duff-Gordon* is, of course, a progenitor of the UCC.

Had the district court followed this proper mode of analysis, its conclusion would have been different. The purpose of the Agreement was for Acheron to serve as reseller of Cook Medical's products to the VA and DOD though various government procurement vehicles, including an FSS contract. But Acheron could not obtain an FSS contract and use it to sell Cook Medical products if Cook Medical did not cooperate with the VA's request for access to its sales records. Such access is required by government regulation where a reseller representing the manufacturer's information does not have significant sales to the general public and sales are expected to exceed $500,000. 48 CFR § 515.408(b)(5). The purpose of this requirement is to enable the VA to fulfill its mandate of assuring itself that the offered pricing is fair and reasonable and not, for example, marked up via the conduit of a reseller. This requirement is also posted on the VA's website for all to see.

Acheron was a recent start-up company and therefore lacked significant sales to the general public, and sales by Acheron of Cook Medical's products were expected to exceed $500,000. Cook Medical knew this, and prior to the execution of the Agreement Acheron did exactly what 48 C.F.R. § 515.408(b)(5) required: it *sought and did obtain* a written and signed authorization from Cook Medical agreeing to provide the VA with "all . . . needed records to support this contract award." *(*Dkt. No. 73-7).

Thus, Acheron had previously obtained Cook Medical's consent to provide access to the very Cook Medical's sales records that the OIG was seeking in its August

14, 2014 letter. Acheron had every reason to believe such cooperation would be forthcoming, and indeed the success of the Agreement depended on it for Acheron to obtain an FSS contract, which Walters himself acknowledged. By (i) allowing Cook Medical to declare a breach based on Acheron's inability to obtain an FSS contract that Cook Medical itself had caused and (ii) sanctioning Cook Medical's subsequent termination of the Agreement on that basis, the district court essentially allowed Cook Medical to purposefully deprive Acheron of the benefit of the bargain as intended by the Agreement. This outcome is precisely what the UCC's implied obligation of good faith and fair dealing was designed to prevent.

Considering these undisputed facts and circumstances, the absence of a provision in the Agreement explicitly stating that Cook Medical would cooperate with the OIG should not have ended the inquiry, as the district court believed. Instead, the district court should have applied the facts and evidence of record to find such cooperation implied by the duty of good faith and fair dealing. Such a finding would not have contradicted or substituted for any express term in the Agreement but would simply have applied the Agreement consistent with the surrounding circumstances existing at the time the Agreement was made. *See Courtesy Enters., Inc. v. Richards Labs.*, 457 N.E.2d 572, 577 (Ind. Ct. App. 1983) ("The essence of good faith among merchants is the observance of commercial standards of fair dealing . . . measured by what a reasonable person in the trade ought to have done.").

*Biomet Inc. v. TACT Med. Instruments Inc.*, No. 3:01 CV 895, 2005 WL 1563429 (N.D. Ind. June 30, 2005), *aff'd*, 454 F.3d 653 (7th Cir. 2006) illustrates the proper application of these principles in an ICC context similar to that here. There, a distribution agreement was silent on the subject of the location of the return delivery by the distributor of unsold inventory upon termination of the agreement. *Id.* at **3, 5–6. Over the manufacturer's objection, the distributor delivered the items back to the United States rather than Japan, which had the effect of causing the inventory to be devaluated and made it extremely difficult for the manufacturer to re-enter the Japanese market. *Id.* at *3. The distributor moved for judgment as a matter of law on the basis that the agreement imposed no duty on it to deliver the product in Japan. But citing Ind. Code § 26-1-1-203, the district court determined that the ICC imposed an obligation on the distributor not to take "opportunistic advantage" of the silence of the agreement regarding the place of delivery, and that reasonable commercial standards of fair dealing dictated that the distributor's delivery of the goods should have been in Japan. *Id.* at *6. In the process, the district court admonished against "gamesmanship" and "lack of cooperation" that only serves "to decrease the total social welfare that contracts attempt to maximize." *Id*. at *7.

Here, the district court did not take such an approach. Relying on the integration clause, it simply refused to look beyond the four corners of the Agreement and did not consider reasonable commercial standards of cooperation and fair dealing to the extent

they supplemented and explained the gaps in the Agreement. (A-10-11, 17-18). This was not the correct mode of analysis.

Seventh Circuit case law also does not share the district court's constricted view of the good faith and fair dealing obligation. As this Court has put it, "[t]he parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract." *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990). Thus, the silence of a contract on a specific duty is not dispositive; rather, more determinative is what a reasonable person in the trade ought to have done, as long as such a result does not *contradict* the terms of the agreement. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). As well, a party must "avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). Stated another way, good faith is "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Mkt. St. Assocs. Ltd. P'ship. v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991).

The district court purported to find justification for its conclusion in general

statements appearing in two non-UCC Seventh Circuit cases explaining that the obligation of good faith and fair dealing does not permit a party to enforce an obligation not present in the contract. *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013); *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (concurring opinion). (A-15-16). But such overbroad pronouncements, made in dicta, are not compatible with the Seventh Circuit's recognition that the duty of good faith and fair dealing imposes a duty to cooperate in the performance stage of a contract, as just explained.

This recogntion also reflects the general position of the common law. The duty to cooperate is a species of good faith and fair dealing that comes "from the fact that one party cannot fully perform or receive its compensation if the other does not work with it." 6 Peter Linzer, Corbin on Contracts § 26.15, at 526 (Joseph M. Perillo, ed., 2010); *see also* Restatement (Second) of Contracts § 205 cmt. d (1981). That an agreement does not explicitly recite any such duty does not mean it does not impliedly exist. As one court aptly put it:

> [W]hen a party to a contract is accused of breaching the implied covenant of good faith and fair dealing by failing to cooperate, that party will get nowhere by responding that the duty to render the specific act of cooperation is not stated in the contract. Of course the duty is not explicitly stated. The duty is implied unless it is expressly excluded. *[citation omitted].* That is why it is called "the implied duty of good faith and fair dealing" instead of "the explicit duty of good faith and fair dealing."

*Rousonelos v. Leach*, 2013 IL App (4th) 130268-U, ¶ 136.[9]

Stated otherwise, the implied covenant is a gap filler that a court reads into an agreement to prohibit one party from doing "anything that will destroy the other party's right to receive the benefit of the contract." *Voyles v. Sandia Mort. Corp.*, 196 Ill. 2d 288, 296 (2001) (quotations omitted). To conclude, as the district court did, that the absence of an explicitly expressed duty in the agreement bars the recognition of such a duty undermines the whole concept of an implied duty of good faith and fair dealing.

Other cases echo this common-sense approach in situations, as here, where reliance on the silence of an explicit term requiring cooperation in providing information would deprive the other party of the benefit of the bargain. In *Spircoff v. Spircoff*, 74 Ill. App. 3d 119, 128 (1st Dist. 1979), a brother and sister entered into agreement under which the sister retained ownership of a parcel of land while the brother retained the right to sell, but the sister refused to provide financial statements necessary to effectuate the sale. *Id.* The court held that the implied duty of cooperation required providing such information notwithstanding the absence of an express provision saying so. *Id.*; *see also Kipnis v. Mandel Metals, Inc.*, 318 Ill. App. 3d 498, 504–05

---

[9] *Rousonelos* is an unpublished order. Under the Illinois Supreme Court Rules, parties may not cite unpublished orders of Illinois appellate courts as authority. Ill. Sup. C. R. 23(e) (eff. April 1, 2018). But they are not barred from using the reasoning and logic that an Illinois appellate court used in its unpublished decision. Furthermore, courts sitting in other jurisdictions are not barred from citing or relying on such unpublished orders in their dispositions. *Osman v. Ford Motor Co.*, 359 Ill. App. 3d 367, 374 (4th Dist. 2005).

(1st Dist. 2000) (where a contract allowed an employee to make a *bona fide* offer to purchase a division of his employer which, if rejected, would obligate the employer to pay the employee 25% of the amount of his offer, the court held the duty to cooperate required the employer to provide financial information such that *bona fide* offer could be made notwithstanding the absence of an explicit contractual requirement to do so).

Even in the non-UCC context, Indiana law is not as one-dimensional as the district court depicts when a contract does not contain an express term controlling the dispute in question. Where a contract is silent or indefinite regarding a term needed to effectuate its purpose, Indiana law looks to the intention of the parties to impute the necessary term. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). "In determining the intention of the parties, a contract should be considered in the light of the surrounding circumstances existing at the time it was made. The court should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract." *Id.* (quoting *Coleman v. Chapman*, 220 N.E.2d 285, 288 (Ind. Ct. App.1966)).

In sum, a district court interpreting a contract must be conscious of the "long tradition in contract law of reading contracts sensibly," not as "parlor games but [as] the means of getting the world's work done." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) (quoting *Rhode Island Charities Tr. v. Engelhard Corp.*, 267 F.3d 3, 7

(1st Cir. 2001)). The district court's decision was not faithful to that tradition.[10]

## B. The District Court Erred in Concluding that the Prevention Doctrine Did Not Excuse Acheron's Inability to Obtain an FSS Contract.

Closely akin to the duty of good faith and fair dealing is the common law prevention doctrine: that a party who prevents the other party's performance may not stand on that non-performance to refuse to perform his part of the contract. This principle has long been followed in Indiana law. *See Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 620 (Ind. Ct. App. 2000) ("the common law of contracts excuses performance of one party where the other party wrongfully prevents that performance"); *Maddox v. Wright*, 489 N.E.2d 133, 137 (Ind. Ct. App. 1986); *Stephenson v. Frazier*, 399 N.E.2d 794, 798 (Ind. Ct. App. 1980); *Herremans v. Carrera Designs, Inc.*, 157

---

[10] Although not dealt with on the motion for summary judgment, facts elicited at the subsequent trial on Cook Medical's counterclaim revealed the true reason Cook Medical ultimately decided to no longer pursue an FSS contract through Acheron: because it saw an opportunity to cut Acheron out as the middle man. This was documented in a series of emails exchanged internally by Cook Medical representatives in March 2015 after Walters had assured a VA official on February 27, 2015 that Cook Medical was "fine with completing the OIG audit" and shortly before Walters had informed Acheron that Cook Medical had decided not to proceed with an FSS contract through Acheron. In those emails, Walters, after learning of the existence of a memorandum of understanding (MOU) between the VA and the DOD allowing VA facilities to purchase off a DAPA, commented to other Cook Medical representatives: "Based on this, I would say we are good go with DAPA as a solution for endoscopy." In a subsequent email to a prime vendor, Walters referred to the MOU and stated that "there is a good possibility we are not going forward with the FSS and Acheron (not public knowledge yet)." (Dkt. No. 158, Day 1 Transcript of Trial at 171–78; Dkt. No. 166, Exs. 53, 54). This was exactly the type of opportunistic advantage-taking that this Court has stated it will not countenance. *Mkt. St. Assocs. Ltd. P'ship. v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991).

F.3d 1118, 1124 (7th Cir. 1998) (applying Indiana law) (the prevention doctrine forbids "a party to a contract to take an unjustified step to prevent the other party from performing his contractual undertaking and thus to precipitate that party into a breach"). To the same effect, when a party retains control over whether a condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy that condition. *Hamlin v. Steward*, 622 N.E.2d 535, 540 (Ind. Ct. App.1993).

This case is a perfect example of a party wrongfully preventing the other party from performing and precipitating that party into a breach. The prevention doctrine obligated Cook Medical to cooperate with the VA's request for certain of its commercial sales information so that the VA could properly evaluate the FSS solicitation submitted by Acheron as reseller of the Cook Medical endoscopy products that Acheron was representing. This was necessary in order for the VA to verify that the proposed FSS pricing was not inflated and to determine that the pricing would be fair and reasonable based on pricing for Cook Medical's similarly situated most favored commercial customers. Not only was this a mandate imposed by a FAR regulation, but it was published on the VA's website and Cook Medical had given its written assurance (more than once) that it would allow the VA access to such information. By refusing to cooperate with the VA OIG's information request, Cook Medical wrongfully prevented Acheron's performance; and when it subsequently terminated the Agreement based on Acheron's failure to obtain an FSS contract, it further breached the Agreement

rendering Cook Medical liable for damages for the loss of Acheron's benefit of the bargain.

The district court acknowledged Indiana law recognized the prevention doctrine but maintained that its application was limited to the circumstance of a condition precedent in a contract in which the condition must be performed before the agreement of the parties becomes a binding contract, which was not the situation here. (A-12–13). It further determined that even if it was a condition precedent, the party accused of preventing performance must have been acting in violation of some duty expressed in the contract. As the district court found no duty was imposed by the contract upon Cook Medical to cooperate with the OIG information request, the prevention doctrine did not apply. (A-12–15).

This was error. The authority cited by the district court does not support its view of such a constricted application of the prevention doctrine. For example, the district court distinguished Acheron's citation of the Restatement (Second) of Contracts § 245 (1981) by noting that comment a. to section 245 states that the rule only applies "where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court." (A-13). But as this very quote itself indicates, the equitable prevention doctrine calls for the imposition by the court of a term of cooperation where called for. Under the facts of this case, such an implied term is warranted. Similarly, the district court claims that Restatement

(Second) of Contract § 225 (1981), also cited by Acheron, "makes it clear that the non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." (A-13). But even in the quoted language supplied by the district court to underscore its point, the Restatement goes on to add:

> The same term may, however, be interpreted not only to make an event a condition of the obligor's duty, but also to impose a duty on the obligee that it occur. *And even where no term of the agreement imposes a duty that a condition occur, the court may supply such a term.*

Restatement (Second) of Contract § 225 (1981) (emphasis added].

The district court also cited 13 Williston on Contracts § 39:11 (4th ed.) for the proposition that "there is no prevention when the conduct which allegedly prevented performance was permissible under the terms of the contract," and extensively quoted from Williston's citation to *Whitt v. Godwin*, 139 S.E.2d 841 (Va. 1965), to illustrate that principle. In *Whitt*, plaintiff had entered into a contract with defendant under which plaintiff agreed to relinquish his rights to acquire stock of a corporation in consideration for the return of $12,000 which he had paid defendant on account. Defendant had turned the money over to a mortgage company as a commitment fee to obtain a loan. The mortgage company agreed to turn over $6,000 and requested a release from parties for the balance, but plaintiff refused to sign and then sued for the money. The court rejected the defense that plaintiff prevented performance because plaintiff had never undertaken the obligation to sign a release. (A-14-15).

*Whitt's* facts are not comparable to those here. There, the obligation was simply

one of payment. The *Whitt* defendant could have obtained the $6,000 from another source to perform its obligation under the contract; therefore, plaintiff was not doing anything to prevent defendant's performance. Here, by contrast, it was *impossible* for Acheron to fulfill its obligation to obtain an FSS contract to sell Cook Medical's products without the cooperation of Cook Medical. The Agreement memorialized a joint endeavor, with Acheron representing Cook Medical's products to the VA, and Cook Medical's cooperation was necessary to make the Agreement work. Indeed, Williston's treatise itself elsewhere recognizes that "[w]henever the cooperation of one party is *necessary* for the other party's performance, there is an implied condition that such cooperation will be given." 6 Williston on Contracts § 887 at 427–31 (3d ed. 1962) (emphasis added).

A more apt illustration, brought to the district court's attention below and strikingly analogous to the present facts, is provided by the Restatement:

> A contracts to sell and B to buy A's rights as one of three lessees under a mining lease in Indian lands. The contract states that it is "subject only to approval by the Secretary of the Interior," which is required by statute. B files a request for approval but A fails to support B's request by giving necessary cooperation. Approval is denied and A cannot convey his rights. B has a claim against A for total breach of contract. A's breach of his duty of good faith and fair dealing contributed materially to the non-occurrence of the condition, approval by the Secretary of the Interior, excusing it.

Restatement (Second) of Contracts § 245, cmt. a, illus. 4 (1981) (illustration suggested by the facts in *Vanadium Corp. of Am. v. Fid. & Deposit Co. of Md.*, 159 F.2d 105 (2d Cir.

1947)).

As in this illustration, here approval by the VA was required by regulation to obtain an FSS contract. Cook Medical failed to support Acheron's application by providing information it previously had agreed to provide resulting in denial of approval by the VA, so Acheron had a valid claim against Cook Medical for "total breach of contract", excusing Acheron's inability to obtain the VA's approval.[11]

## C. The District Court Erred by Refusing to Read the Agreement's Force Majeure Clause as Requiring Cook Medical to Cooperate in Eliminating the Cause That Was Preventing Obtaining an FSS Contract.

Even if one accepted the district court's premise that the duty of good faith and fair dealing does not apply unless related to a duty expressed in the Agreement, the Agreement did in fact contain a provision entitled "force majeure" that, when read in light of commercial reasonableness and the intent of the Agreement, required Cook Medical to provide such cooperation in the case of an "act of government or agency."

Article X, ¶ 4 of the Agreement states, in relevant part:

---

[11] The district court distinguished all of the Indiana cases cited by Acheron with regard to the prevention doctrine on the basis that "[e]ach of them involved the failure of a party to perform a duty that existed in the contract." (A-15 n. 9). That is not accurate. *Rogier*, for example, did not impose an explicit duty in the contract on the defendant in conferring an exclusive right to resell to the plaintiff. 734 N.E.2d at 620–21. *See also Maddox*, 489 N.E.2d at 136–37 (applying prevention doctrine in case of refusal to accept pre-payment of balance of contract price, though no such duty appeared in the contract). In none of the Indiana cases cited did the court find that for the prevention doctrine to apply there had to be a failure of a party to perform a duty explicitly stated in the contract. Implying such a requirement would indeed be self-defeating in light of the equitable underpinning of the doctrine.

> Neither COOK nor any Affiliate nor DISTRIBUTOR shall be liable for any delay or default caused by force majeure, *including, without limitation . . . act of government or . . . agency . . . .* The party affected by such a condition shall use *every reasonable effort* to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

(Dkt. No. 73-15 at 9) (emphasis added).

Noting this Court's teaching that "[a] force majeure clause must always be interpreted in accordance with its language and context, like any other provision in a written contract, rather than with reference to its name," *Wis. Elec. Power Co. v. Union Pac. R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009), the district court read the VA's requirement that Cook Medical's sales information be provided in order to consider the FSS solicitation as "an act of government or . . . agency." (A-11). The district court further determined it was this government requirement that caused Acheron not to obtain an FSS contract to sell Cook Medical's products. (*Id.*) Yet the district court construed the language "party affected by such a condition" as referring solely to Acheron since it was Acheron's ability to perform its obligation under the Agreement that was caused by the government's action and it was Acheron who had to "resume performance as soon as possible." (*Id.*). It therefore refused to read into Article X, ¶ 4 any duty on Cook Medical's part to assist Acheron in correcting the cause that was preventing performance. (*Id.*).

Reading Article X, ¶ 4 with a blinkered literalism could support such an interpretation, but not if it is read in the context of the Agreement as a whole imbued by

the good faith and prevention doctrines. In applying for the FSS contract, Acheron was representing Cook Medical's products as its reseller to the government. Obtaining an FSS contract was a *mutual* objective of their joint commercial endeavor that could not be achieved without cooperation from Cook Medical as Acheron's principal. Viewed accordingly, Acheron was not the only "party affected" by the government's "act." Cook Medical was affected as well; indeed, recall that the VA OIG directed its request for the sales information to Cook Medical. (Dkt. No. 73-8). Therefore, it was incumbent on Cook Medical as much as Acheron to use "every reasonable effort to correct or eliminate the cause which prevents performance," something that in fact only Cook Medical had the power to do. In this instance, "resuming performance" would include Cook Medical honoring the Letter of Authorization it had signed agreeing to allow VA access to such information and its later pledges to the VA after the latter's issuance of the no-award letter that "[w]e at Cook Medical are fine with completing the OIG audit at this point." (Dkt. No. 68-12).

Accordingly, Article X, ¶ 4 of the Agreement was breached by Cook Medical's refusal to cooperate with the OIG audit and further by Cook Medical's reliance on Acheron's resultant inability to obtain an FSS as its stated basis for later terminating the Agreement.

### D. Section 515.408(b)(5) Was an Implied Term of the Agreement; Once Acheron Obtained Cook Medical's Authorization for VA Access to Its Sales Records, It Fulfilled that Term and Cook Medical Could Not Terminate the Agreement for Not Obtaining an FSS Contract.

As with the implied duty of good faith and fair dealing, the laws of most jurisdictions, including Indiana, recognize that unless the contract provides otherwise all applicable law in force at the time of entry into the agreement impliedly forms a part of the agreement without any need for an independent statement to that effect. *Miller v. Geels*, 643 N.E.2d 922, 928 (Ind. Ct. App. 1994) (quoting *Ethyl Corp. v. Forcum–Lannom Assoc's*, 433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982)). Courts presume that the parties operate their businesses with the law in mind. *Id.* The same principle is recognized with respect to the FAR system, where courts will read into a federal procurement contract such federal administrative regulation if it carries out a deeply ingrained strand of public policy, knowledge of which is imputed to the contractor. *G.L. Christian & Assocs. v. U.S.*, 312 F.2d 418 (Ct. Cl. 1963) (known as the Christian Doctrine).

The district court declined to apply the Christian Doctrine here, noting Acheron cited no authority extending it to contracts between private parties that relate to federal contracts, (A-16),[12] though it acknowledged the applicability of the aforementioned

---

[12] The district court itself cited no authority why the Christian Doctrine should not extend to a third party, like Cook Medical, on whose behalf the contract exists and who reaps its benefits. In any event, case authority does exist that it should. *See, e.g.*, *UPMC Braddock v. Harris*, 934 F.Supp. 2d 238, 258–59 (D.D.C. 2013) vacated on other grounds and appeal dismissed *sub nom*);

Indiana case law. It nonetheless concluded that even if the applicable regulation (48 C.F.R. § 515.408(b)(5)) was an implied term of the Agreement, that did not alter the result because Section 515.408(b)(5) "did not govern the relationship between Acheron and Cook Medical, but rather Acheron's relationship with the VA" and did not impose any obligation on Cook Medical to provide its sales information. (A-17–18).

This is too facile a conclusion. Section 515.408(b)(5) provides that when a reseller represents a manufacturer's products, does not have significant sales to the general public, and the sales under the resulting FSS contract are expected to exceed $500,000, then it must obtain "written authorization from the manufacturer(s) for Government access, at any time before the award . . . to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer." It is uncontroverted that Acheron obtained such a written authorization from Cook Medical. At that point, Acheron was in full compliance with that implied term of the Agreement (48 C.F.R. § 515.408(b)(5)). Acheron was entitled to rely on that authorization. Cook Medical cannot claim that Acheron was in breach of the Agreement for not obtaining an FSS contract because it was Cook Medical's dishonoring of its own Letter of Authorization that was the proximate cause of Acheron not being able to obtain an FSS contract.

---

*UPMC Braddock v. Perez*, 584 Fed. Appx. 1 (D.C. Cir. 2014) (applied to hospitals providing medical products and services to government employees under contract between primary contractor and Office of Personnel Management); *Fleming Steel Co. v. W.M. Schlosser Co.*, Inc., No. CIVA 02-828, 2006 WL 1892699, at *9 (W.D. Pa. July 10, 2006) (applied to subcontractor).

### E. The District Court's Basis for Rejecting Acheron's Election of Remedies Argument Was Factually Wrong.

The district court also erred in rejecting Acheron's contention that Cook Medical forfeited any right to terminate the Agreement when Walters notified Acheron in March 2015 and again the following month that Cook Medical would no longer participate in efforts by Acheron to obtain an FSS to sell its products but that the contract "remain[ed] in place."(Walters Dep. at 381–83, 408–10; Dkt. No. 68-13). Acheron argued that once Cook Medical elected to continue to maintain the Agreement in effect and accept its benefits notwithstanding the failure to obtain an FSS contract, it could not go back and use the inability to obtain an FSS contract as a basis for terminating the Agreement. (Dkt. No. 54 at 24–25).

Acheron cited as authority the Restatement and Williston recognizing the "election of remedies" doctrine, which holds that if a non-breaching party elects to continue to accept performance of the breaching party, it thereby affirms the contract and cedes its right to terminate based upon such breach. *(Id.*; Restatement (First) of Contracts, § 309 (1932); 5 Williston on Contracts § 684 (Rev. ed. 1961)).[13] The district court dismissed this authority because Acheron did not cite any cases suggesting that Indiana follows it, and determined in any event that Acheron could not point to any

---

[13] *See also Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011–12 (S.D.N.Y. 1995) *aff'd*, 101 F.3d 108 (2d Cir. 1996) ("Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches").

benefits that Cook Medical received from the contract after the April 6, 2015 email, nor did it explain what Walters could have meant by "the contract remains in place." (A-20). In the district court's words:

> Cook was under no obligation to pay Acheron any further commission under the Agreement unless and until it obtained an FSS for Cook's products, and there is no dispute that Acheron would not be doing so. Therefore, while Walters may have wanted to salvage some sort of relationship between the two parties, and while he might have believed that relationship could be governed by the Agreement, it could not.

(*Id*.).

This was factually wrong. In his testimony, Walters stated exactly what remained in place: transacting business through other government contract vehicles like BPAs and IDIQs and other forms of business with the VA. (Walter Dep. at 381–83, 408–410; Dkt. No. 68-13 at 5). The FSS was but one contract vehicle through which the Agreement gave Acheron the right to resell Cook Medical's products. (Dkt. No. 68-3 at 15). The relationship thereby continued for several months while Acheron pursued sales through those vehicles before Cook Medical decided on July 1, 2015 to claim a breach based on Acheron's purported failure to obtain an FSS and terminate the Agreement on that basis. Under the election of remedies doctrine, Cook Medical's decision to terminate based on a prior alleged breach was a renouncement of its earlier election to continue the Agreement. But having made an election of remedies, Cook Medical was foreclosed from now claiming such breach and terminating the Agreement on that basis.

Separate and aside from the election of remedies doctrine, principles of waiver, estoppel, and modification apply and compel the same result here. Waiver is the intentional relinquishment of a known right. *Ogle v. Wright*, 360 N.E.2d 240, 245 (Ind. Ct. App. 1977). Silence, acquiescence, or inactivity can constitute waiver if the waiving party has a duty to speak or act. *Lafayette Beverage Distribs., Inc. v. Anheuser–Busch, Inc.*, 545 F.Supp. 1137, 1149 (N.D. Ind. 1982). Estoppel focuses on the effect of one's conduct; an estoppel arises when one's conduct (not his/her manifested intent) misleads another into believing that a right will not be enforced and causes the other party to act to his detriment. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). The principles of waiver and estoppel support the notion that a party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for non-compliance. *Id.* Parties to a contract may also mutually modify their contractual undertakings. *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1084 (Ind. Ct. App. 1991). A modification can be implied from the conduct of the parties. (*Id.*).

All three of these doctrines also apply here. Walters' affirmation to Acheron that the Agreement remained in place in order to transact business through other government contract vehicles like BPAs and IDIQs amounted to an assurance that compliance with the requirement of obtaining an FSS contract would not be required on a going forward basis. Cook Medical was thereby foreclosed by these equitable

constructs from thereafter claiming breach by Acheron and terminating the Agreement on that basis.

## II. The District Court's Decision that the Agreement Did Not Evince an Intent to Give Acheron the Exclusive Right to Sell Cook Medical's Endoscopy Products to the DOD Was Contrary to the Facts of Record.

As noted, the Agreement appointed Acheron as exclusive distributor of Cook Medical's endoscopy products to the DOD, and Exhibit A to the Agreement designated that DAPA contracted sales were to be "ordered directly through Acheron." (Dkt. No. 68-3 at 2, 15). Acheron had duly loaded Cook Medical's endoscopy products onto its DAPA during the run-up period to the Agreement in order to sell those products, but soon after the Agreement was executed Cook Medical decided not to deactivate its own DAPA. Because the same products cannot be on more than one DAPA, Cook Medical thereby prevented Acheron from making *any* sales of Cook Medical's endoscopy products to the DOD through its own DAPA, despite Acheron's designation as exclusive distributor. Acheron contended this was a further breach of the Agreement.

The district court, however, determined that the designation of Acheron as an exclusive agency did not create an exclusive right to sell prohibiting direct sales by the principal unless the language of the Agreement contained other language indicating that the parties intended to prohibit a direct sale by the principal. (A-18–19) (citing 2A C.J.S. Agency § 325). The district court found that the Agreement contemplated direct

sales would continue, noting that the Agreement "does not provide for any payment of commissions to Acheron (other than on Cook's own sales) until '[a]fter the date [Acheron] obtains the Federal Supply Schedule contract.'" (A-18) (citing Dkt. No. 68-3 at 6)).

This was error. At the outset, the district court overlooked that, as was revealed in the record, Cook Medical itself is a distributor. It constitutes the distribution arm of its sister company, Cook Incorporated, which manufactures the medical products that Cook Medical distributes. (Dkt. No. 70-1 at 13, attached to Cook Medical's Response to Acheron's Summary Judgment Motion). Thus, the literal language of the Agreement— stating that "[Cook Medical] hereby appoints [Acheron] and [Acheron] hereby accept appointment, as . . . *exclusive distributor* of [endoscopy] products [to the DOD]," (Dkt. No. 68-3 at 2 [emphasis supplied])—brooks no meaning other than that no other distributor—Cook Medical included—could sell those products to the DOD.

The district court further erred in relying on Article V, ¶ 3 of the Agreement to find that the Agreement allowed Cook Medical to make direct sales and that Acheron was not even entitled to any commissions until after the date Acheron obtained an FSS contract. In so finding, the district court ignored Walters' testimony explaining the very limited circumstances in which the Agreement allowed direct sales (i.e. non-government contract open market sales) by Cook Medical.

Thus, Walters explained that Article V, ¶ 3 was meant to be read in conjunction

with the last column on Exhibit A to the Agreement headed "Direct Sales". (Dkt. No. 68-3 at 15). The insertion of that column denoted that Cook Medical could make direct sales of a product line during the period the parties awaited an FSS application on that product line to be acted on, during which time Acheron would be compensated at 3% of those sales for its preparatory costs during the application process. Article V, ¶ 3 was a specific reference to the FSS process on endoscopy that was already underway. (Walters Dep. 226–35).

Walters made clear that the intendment of the Agreement was to preclude Cook Medical from competing with Acheron for endoscopy sales during the life of the Agreement, and that after the end of 2014 all direct endoscopy sales would have been phased out in favor of government contract sales through Acheron, with the sole exception being if the government, unsolicited, directly approached Cook Medical for a sale. (*Id.*) Thus, the fact that Article V, ¶ 3 refers to Cook Medical endoscopy sales "in the Territory," *i.e.* to the VA and the DOD, did not mean that Cook Medical could arbitrarily circumvent Acheron's status as exclusive distributor of endoscopy products and make all DOD sales itself.

In short, nothing in the Agreement allowed Cook Medical to foreclose Acheron from *making any DAPA sales at all* by refusing to deactivate its own DAPA. Exhibit A to the Agreement reserved DAPA contracted sales to Acheron. Walters even described his refusal to deactivate Cook Medical's DAPA as "simply a business decision", rather than

one authorized by any specific contractual right. (Walters Dep. at 308–11, 407–08).

Moreover, even if *arguendo*, the district court was correct in its analysis that the Agreement created only an exclusive agency rather than an exclusive right to sell, it nonetheless should have seen Cook Medical's refusal to deactivate its DAPA as effectively reading out of the Agreement that exclusive agency as well, because absent that deactivation Acheron could not make *any* DAPA sales and was effectively deprived of the benefit of its bargain. Here again, a less myopic reading of the Agreement tempered by the implied obligation of good faith and fair dealing and the prevention doctrine would have compelled the conclusion that Cook Medical breached the Agreement by preventing Acheron from making any DAPA sales.

This was a separate breach by Cook Medical, precluding Cook Medical from declaring a breach by Acheron. Cook Medical therefore breached the Agreement by terminating it.

## CONCLUSION

The district erred in granting Cook Medical's motion for partial summary judgment and denying Acheron's cross motion for summary judgment on the complaint. It was undisputed that under the applicable regulation governing obtaining an FSS contract, Acheron could not obtain one and use it to resell Cook Medical's endoscopy products if Cook Medical did not cooperate with the VA's request for access to its sales records to verify the pricing information Acheron submitted. It was further

undisputed that Acheron did obtain a Letter of Authorization from Cook Medical, as required by that regulation, in which Cook Medical had agreed to allow the VA such access. The district court erred in its ruling that the implied covenant of good faith and fair dealing and the prevention doctrine did not apply because the Agreement did not contain an express requirement that Cook Medical had to cooperate. The district court further erred in ruling that Cook Medical's foreclosure of Acheron from making DAPA sales was permissible.

The district court's summary judgment ruling on Acheron's complaint should therefore be reversed and judgment should be entered in favor of Acheron and against Cook Medical, with the case remanded to determine Acheron's damages. Alternatively, the ruling should be reversed, and the case remanded for the determination of any issue of material fact.

Respectfully submitted,

ACHERON MEDICAL SUPPLY, LLC

*/s/ Irving M. Geslewitz*
Irving M. Geslewitz
Much Shelist, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606-2000
(312) 521-2414

Bradley J. Wombles
Norris Choplin Schroeder LLP
101 West Ohio Street, Ninth Floor
Indianapolis, Indiana 46204-4213
(317) 269-9330

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 13,594 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font.

Dated:   September 16, 2019

/s/ *Irving M. Geslewitz*
Irving M. Geslewitz
Attorney for Appellant

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

/s/ *Irving M. Geslewitz*
Irving M. Geslewitz

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2019, the Brief of Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Irving M. Geslewitz*
Irving M. Geslewitz

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Entry on Motions for Summary Judgment and Related Motions, Doc. 91
filed 09/28/17 ................................................................................................... A-1

Judgment, Doc. 149, filed 06/24/19 ................................................................. A-22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ACHERON MEDICAL SUPPLY, LLC, | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
|     vs. | )   Cause No. 1:15-cv-1510-WTL-MPB |
| | ) |
| COOK INCORPORATED, et al., | ) |
| | ) |
|   Defendants. | ) |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS

This cause is before the Court on the Plaintiff's Motion for Partial Summary Judgment on the Complaint and for Summary Judgment on the Counterclaim (Dkt. No. 53) and the Defendants' motion for partial summary judgment (Dkt. No. 56).  The motions are fully briefed and the Court, being duly advised, **GRANTS** the Defendants' motion and **DENIES** the Plaintiff's motion for the reasons set forth below.  In addition, the Court **GRANTS** the Plaintiff's Motion for Leave to Amend Its Appendix of Evidence in Support of Its Motion for Partial Summary Judgment (Dkt. No. 73) and **DENIES** the Defendants' motion to file a surreply (Dkt. No. 79), as the issues addressed therein ultimately are not material to the Court's ruling.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all

A-1

reasonable inferences in that party's favor.").  When the Court reviews cross-motions for summary judgment, as is the case here with regard to the Plaintiff's claims, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted). "'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).  A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  FACTS OF RECORD[1]

On July 24, 2014, Defendant Cook Medical LLC ("Cook") and Plaintiff Acheron Medical Supply, LLC ("Acheron") entered into a five-year Distribution Agreement (the "Agreement").  Pursuant to the terms of the Agreement, Acheron was to serve as a distributor (or reseller) of designated medical devices and products to the Department of Defense Medical Centers ("DOD") and the Veterans Administration ("VA").  Specifically, the Agreement stated that Acheron was appointed as Cook's exclusive distributor to the DOD and VA for the products

---

[1]The parties disagree regarding which facts are material to the resolution of the issues before the Court.  The Court has included in this section the properly supported facts asserted by the parties that are necessary to orient the reader and that serve as a basis of the parties' arguments, even though ultimately some of them are not material to the Court's ruling. Additional material facts are included in the Court's discussion where relevant to the analysis.

A-2

and devices of Cook's Endoscopy business unit and a non-exclusive distributor for the products

of its other business units.  The Agreement provides that:

> This Agreement and any instrument, document, plan or procedure incorporated
> into this Agreement by reference shall constitute the entire Agreement between
> the parties as to the subject matter hereof and supersedes all prior oral or written
> agreements as to such subject matter. No representations other than those
> contained herein are made by either party to the other.

Dkt. No. 1-1 at 11-12.  It further provides that "[n]o amendment, modification, or addition to this

Agreement shall be binding on the parties unless reduced to writing and duly executed by [Cook]

and [Acheron]."  *Id.* at 9.

Acheron asserts that its sales to the DOD were to be made primarily through a federal

Multi Award Schedule known as a Distribution and Pricing Agreement ("DAPA").[2]  DAPAs are

awarded by the DOD's Defense Logistics Agency ("DLA") and are one of the DOD's preferred

means of procurement.[3]  Under a DAPA, product prices negotiated by a medical manufacturer or

supplier will be honored by the DOD's prime vendors to supply those products to the DOD.

Both Cook and Acheron were DAPA holders.  Prior to entering into the Agreement, Acheron

had downloaded the Endoscopy products listed on Cook's DAPA onto Acheron's DAPA, and

Acheron's DAPA was approved by the DOD's Defense Logistics Agency ("DLA").  Since a

manufacturer's products can be listed on only one DAPA, in order for Acheron to make sales

---

[2]Cook disputes this characterization of a DAPA, asserting that "[a] DAPA is more like a listing of approved vendors than a 'Multi-Schedule Award' or more properly a multiple-award schedule."  Dkt. No. 70 at 3.

[3]In response to this assertion in Acheron's statement of facts, Cook states that "the DOD can and does make purchases outside of the DAPA through other contracting mechanisms, and Acheron has not established that DAPA sales are the 'primary' mechanism for such purchases."  Dkt. No. 70 at 3.  Acheron does not so allege, however; rather, it states that DAPAs "are *one of the DOD's preferred means of procurement*" and that *Acheron's sales* to the DOD were to be made primarily through a DAPA.  Dkt. No. 54 at 3.  That said, the Court notes that the evidence cited by Acheron does not support its assertion that its sales were to be made primarily through a DAPA.

A-3

through its own DAPA as distributor of Cook's products, Cook would have had to deactivate its

own DAPA. Cook did not do so.  The Agreement makes no reference to Cook transferring its

DAPA sales to Acheron.  Cook continued to make its own sales directly to the DOD.

The Agreement provided that Acheron was to obtain a Federal Supply Schedule contract

("FSS") and use it to sell Cook's products.  An FSS is a type of Multi-Award Schedule contract,

not unlike a DAPA, that the VA enters into with suppliers covering the sale of goods and

services to the VA.  An FSS is a preferred method of procurement by the VA and benefits the

FSS holder because, once it is negotiated and executed, the VA lists the FSS holder's products in

a national schedule at pre-set prices, which is available to all regional or local VA purchasers.

The Agreement contained the following provision:

> Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase price on
> all Endoscopy Products sold by [Cook] in the Territory [defined in the Agreement
> as being the VA and the DOD] between March 1, 2014 and the date [Acheron]
> obtains its Federal Supply Schedule contract,[4] provided such Federal Supply
> Schedule is obtained by the end of the 2014 calendar year."[5]

Dkt. No. 1-1 at 5.  The Agreement further set forth a commission schedule that would govern the

commission paid to Acheron after it received its FSS "on products that are approved on its [FSS]

contract at the time of the sale."  *Id.*  The commission schedule included commissions to be paid

after an FSS contract was obtained by Acheron on any direct sales by Cook in the Territory, i.e.,

to the VA or the DOD.

---

[4]Cook paid Acheron a 3% commission on the relevant sales between March 1, 2014, and December 31, 2014.

[5]Cook cites to this provision as evidence that "[t]he Distribution Agreement contemplated that Acheron would obtain the FSS 'by the end of the 2014 calendar year.'"  The Court does not read it as contemplating that the FSS *would* be obtained by that date, but rather as incentivizing Acheron to aim for that result.

4

A-4

Prior to execution of the Agreement, Acheron submitted its FSS solicitation (application) to the VA proposing 1,384 Cook Endoscopy products for placement on an FSS.  The FSS procurement process is governed by various rules and regulations, including Title 48 of the Code of Federal Regulations (CFR) and the Federal Acquisition Regulations (FAR), specifically FAR Subpart 8.4 and FAR Part 38.  The regulations state that they are designed to ensure that the VA receives a "fair and reasonable" price for the products to be purchased off the FSS.  A person applying for an FSS therefore must follow a Commercial Sales Practices ("CSP") format as prescribed by federal regulation. *See* 48 CFR § 515.408 ("Solicitation provisions and contract clauses"). That format is designed to obtain appropriate and sufficient data so that the assigned government contracting officer can perform a price analysis, determine price reasonableness, and develop objectives for negotiations with respect to the FSS offeror's proposed pricing.

Pursuant to the applicable regulations:

> If you are a dealer/reseller without significant sales to the general public, you should provide manufacturers' information required by paragraphs (1) through (4) above for each item/SIN offered, if the manufacturer's sales under any resulting contract are expected to exceed $500,000. You must also obtain written authorization from the manufacturer(s) for Government access, at any time before award or before agreeing to a modification, to the manufacturer's sales records for the purpose of verifying the information submitted by the manufacturer. The information is required in order to enable the Government to make a determination that the offered price is fair and reasonable. To expedite the review and processing of offers, you should advise the manufacturer(s) of this requirement.

48 CFR § 515.408(b)(5).  As a recently formed company, Acheron did not as yet have significant sales to the general public.  Also, sales under the proposed FSS were anticipated to be well over $500,000.  Therefore, the only way Acheron could obtain an FSS was if Cook allowed the VA access to its sales records.  Cook executed a release that read as follows:

> Cook Medical, LLC agrees to provide access to the Veterans Administration those sales records between Cook and Acheron Medical Supply, our contracted vendor

5

A-5

for medical devices purchased by VA Medical Centers, and all other needed records to support this contract award.  The sole purpose of providing access to this information will be to verify information submitted by the Dealer/Reseller (Acheron Medical Supply) to the Veterans Administration.

Dkt. No. 68-4 at 2.  The release is signed by Ronald Walters on behalf of Cook and dated June 10, 2014.  Acheron asserts that a version of it was originally signed on that date, but language was inserted and the new version, set forth above, was signed by Walters after the Agreement was executed.

An FSS offer is reviewed by a contracting officer in the VA's Office of Acquisition, Logistics and Construction. The contracting officer may request the VA Office of Inspector General's (OIG) involvement in pre-award, post-award, and other requested reviews of FSS proposals and contracts.  The VA OIG's involvement is standard where, as here, a new solicitation proposal with an estimated value of $500,000 or more is made by a reseller that does not have significant commercial sales and who will be representing the manufacturer's information.

On August 14, 2014, the VA OIG sent a letter to Cook asking Cook to submit certain preliminary information as part of its pre-award review of the proposal submitted by Acheron. The letter stated that its objective was to determine: (i) if the CSP and supporting data were accurate and complete; (ii) whether offered prices were equal to or better than those offered to the manufacturer's most favored customers; (iii) those customers who received discounts better than those offered to the Government and the yearly volume or other consideration upon which those discounts were based; (iv) the accuracy of information provided by Cook and Acheron related to any rebate or incentive-type programs; and (v) the identity of those customers who could serve as an appropriate tracking customer under the Price Reduction Clause. A list of eleven items of preliminary information requested to start the review (hereinafter referred to as

6

A-6

the "OIG audit") was attached as Enclosure A to the letter. The VA OIG gave Cook until

September 5, 2014, to submit the requested information.[6]

Cook refused to supply the information requested by the OIG. Acheron attempted to

determine if it could circumvent Cook's refusal to cooperate with the OIG audit, such as by

sharing selected pricing information with the contracting officer. However, on December 28,

2014, the VA sent Acheron a letter that stated, in relevant part:

> Per the solicitation's instructions and Procedural Guideline #22 the offeror and
> the manufacturer must provide dated June 30, 2008, when a dealer/reseller does
> not have significant commercial sales, the Commercial Sales Practices (CSP) and
> other data.[7] The dealer/reseller must also provide written authorization from the
> manufacturer for Government access to its sales records, in order for the
> Government to make a fair and reasonable price determination. In your case,
> Acheron did provide the signed authorization letter from Cook on June 2014,
> stating that the manufacturer would provide Government access to its confidential
> sales data.
>
> Accordingly, the entire proposal package was forwarded to the Office of Inspector
> General (OIG) for pre-award review. On August 14, 2014, the OIG forwarded a
> request for preliminary review materials to both Acheron and Cook with a
> suspense date of September 5, 2014. The OIG did receive some of the originally
> requested information from both parties prior to the suspense due date. On
> September 10, 2014, Acheron spoke with the contracting officer and indicated
> their desire to provide independent information outside of the OIG request.
> Acheron indicated that they were compiling that information for both Cook and
> themselves and would be sending it on for review. After reviewing this provided
> information from both Cook and Acheron contracting does not feel comfortable
> that this information is enough to go outside of the OIG initial request.
>
> Acheron and Cook have been unwilling to provide a complete response to the
> information that was requested by the OIG. The requested data is required to
> review sales data, discounts, evaluate business practices, establish a basis of
> negotiations, and facilitate a (subsequent) fair and reasonable pricing
> determination. It is noted that, to date, Acheron and/or Cook have not provided
> their complete, requested information to the OIG for review. Therefore, due to
> lack of information and non-receipt of required information in accordance with

---

[6]The parties dispute the amount of time and effort it would have taken Cook to provide
the requested information. That fact is not relevant to the Court's resolution of the instant
motions.

[7]This nonsensical sentence is in the original letter.

A-7

> CSP-1 Commercial Sales Practices Format, Point (5), this proposal package is a "no award" this proposal is being returned until that information can be provided for review of this award.
>
> Please submit the required information in a timely manner for review of this contract award. . . . .
>
> If you do not wish to continue with this package please let us know at your earliest convenience.  In the future, if a manufacturer's CSP is required for review, please ensure the manufacturer's cooperation in advance and ensure both parties have sufficient time and resources to support the endeavor.

Dkt. No. 55-7.

After learning of the VA's letter, Walters sent an email to his superior, David Breedlove, Cook's Chief Financial Officer, advising that Cook "will need to provide the OIG access to all Cook Endoscopy pricing for their review and determination of what is fair and reasonable." After meeting with Breedlove, Walters instructed Acheron to resubmit the FSS application to the VA OIG, telling Wesley Pate of Acheron, "[w]e are good to go."  Pate resubmitted the proposal to the VA.

Walters also sent two emails to officials of the VA, one dated January 27, 2015, and the other dated February 27, 2015, in which he expressed Cook's willingness to cooperate with the OIG audit.  However, on or about March 23, 2015, at the direction of Breedlove, Walters informed Acheron that Cook had decided not to proceed with the OIG audit after all.  In response, Pate sent an email to Walters suggesting that, in light of Cook's position, "[i]n order to avoid the look of unwillingness to submit to the government audit process again, we feel that the best solution would be for us to exchange out the Cook submitted products for another vendor that we represent.  In doing so we can hopefully maintain our current status of resubmission for the FSS and avoid Cook rejecting to submit to the OIG requirements."  Dkt. No. 55-6 at 4. Walters responded by email dated April 6, 2015, that he agreed with "your decision to utilize

8

A-8

another company to continue your acquisition of the FSS contract.  It only makes sense, as the

outlook for Cook at this point remains doubtful at best for the near term." *Id.* at 3.   In that email,

Walters also definitively stated that Cook would not be using Acheron to sell to the DOD, as

Cook would be doing that directly through its own DAPA.   Walters continued:

> However, as opportunities present themselves on fbo.gov and other venues within
> the VA segment we will gladly welcome an opportunity to work with you on
> setting up specific business opportunities as they present.  We have both spent a
> tremendous amount of time and money to date for a fraction of the expected
> outcomes.  We'll chalk that up as experience gained from lessons learned.  No
> harm no foul.
>
> Going forward, I think we would like to see Acheron bring Cook some significant
> value in the form of new business opportunities in the VA.  This will be the
> catalyst for getting together to strategize on business.  To be very honest with no
> national contract in play, no national network of contacts in the VA, limited
> exposure to the MSPV players and no regional or national sales force there is
> simply very limited resources from which to develop any meaningful strategy
> from.  I really like you guys and sincerely want to see you succeed, however I
> don't think we are at a point where we can have a meaningful relationship that
> will bring value to both parties.  As I stated on our last call, the contract remains
> in place and we will continue to consider business opportunities with Acheron
> under the terms and conditions of that agreement.

*Id.*  On April 14, 2015, Frank Lauch of Acheron sent a detailed email response to Walters

protesting Cook's abandonment of the OIG audit process and other actions by Cook.

On July 1, 2015, Cook issued Acheron a thirty-day notice to cure, stating that Acheron

was "in material breach of the following essential contractual obligations":

1) Inability to obtain a Federal Supply Schedule contract and use it to sell the
   Endoscopy products.
2) Inability to provide Cook access to a Federal Supply Schedule contract for
   Endoscopy products at pricing that it acceptable to Cook.
3) Failure to use its best efforts to promote, solicit and expand the sale of the
   Products within the Territory.

Dkt. No. 15-2.  Cook then terminated the Agreement on July 31, 2015, based on Acheron's

failure to cure.

A-9

### III.  DISCUSSION

In its Complaint, Acheron asserts a claim for breach of contract, alleging that Cook breached the Agreement by "prevent[ing] Acheron from making sales to DOD medical centers through its DAPA by deciding to withdraw authorization to Acheron to sell its products to the DOD medical centers, in direct and material breach of the Agreement that specifically designated Acheron as exclusive and non-exclusive distributor of Cook products to DOD medical centers" and by "prevent[ing] Acheron from obtaining an FSS contract by refusing to cooperate with an OIG audit that had been precipitated by Cook's own actions in preventing Acheron from demonstrating a history of sales of Cook products by not allowing Acheron to sell Cook's medical products to DOD medical centers in violation of the Agreement."   Dkt. No. 1 at ¶ 44, 45.  In its Answer, Cook asserts a counterclaim for breach of contract against Acheron.  Acheron moves for summary judgment as to Cook's counterclaim and summary judgment as to liability on its own breach of contract claim against Cook.  Cook moves for summary judgment as to Acheron's complaint.

### A.  Cook's Motion for Summary Judgment[8]

In its motion for summary judgment, Cook argues that Acheron's claim for breach of contract is without merit.  The Agreement provides, and the parties agree, that Indiana law governs this dispute.  Under Indiana law,

> Construction of the terms of a written contract generally is a pure question of law. The goal of contract interpretation is to determine the intent of the parties when they made the agreement.  This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole.  If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties intent from the four corners of the instrument.

---

[8]The Court has considered all six of the parties briefs in making this ruling.

10

A-10

*Layne v. Layne*, 77 N.E.3d 1254, 1265 (Ind. App. 2017) (citations omitted).  In this case, the parties do not point to any ambiguity in the language of the Agreement, and the Court agrees that it is unambiguous.  Thus, the Court must begin its analysis by looking at the plain language of the Agreement.

Acheron asserts that Cook breached the Agreement by refusing to cooperate with the OIG audit, thereby preventing Acheron from obtaining an FSS.  As Cook points out, the Agreement contains no provision that expressly mentions an OIG audit.  However, Acheron argues that the force majeure clause in the Agreement obligated Cook to cooperate with the OIG audit.  The provision in question provides:

> Neither COOK nor any Affiliate nor [ACHERON] shall be liable for any delay or default caused by force majeure, including, without limitation . . . act of government or . . . agency . . . . The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

Dkt. No. 1-1 at 9.  The plain language of this term belies Acheron's argument.  *See Wisconsin Elec. Power Co. v. Union Pac. R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009) ("[A] force majeure clause must always be interpreted in accordance with its language and context, like any other provision in a written contract, rather than with reference to its name.").  The provision does not require *both* parties to "use every reasonable effort to correct or eliminate the cause which prevents performance"; it requires "the party affected by such a condition" who, after correcting or eliminating the cause, must "resume performance as soon as possible."  It was Acheron's ability to perform its obligation under the contract that was caused by the government action, and therefore it was Acheron, not Cook, that was the "party affected" and on whom the force majeure clause imposed a duty.

11

A-11

Acheron also points to several legal principles that it argues required Cook to cooperate with its efforts to obtain an FSS contract, including cooperating with the OIG audit. First, Acheron characterizes Cook's position that its duties under the Agreement are determined by the language of the Agreement itself as "a maximalist position [that] perhaps might have had currency in some precincts in the 19th century," and argues, citing *Wood v. Lucy, Lady Duff-Gordon*, 22 N.Y. 88 (1917), that "the law has long since moved beyond that."  However,

> Indiana courts zealously defend the freedom to contract. *Peoples Bank & Trust Co. v. Price,* 714 N.E.2d 712, 717 (Ind. Ct. App. 1999).  "The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract."  *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 221 (Ind. 2009) (citations omitted); *See also, New Welton Homes v. Eckman,* 830 N.E.2d 32, 35 (Ind. 2005) (Courts must not displace the contractually specified rights and remedies but "must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and . . . enforce them as agreed upon.").

*State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 160 (Ind. 2016).  "Primitive" or not, Indiana law still very much eschews the practice of courts inferring duties that the parties have not included in their unambiguous contracts.

That said, Acheron is correct that Indiana has recognized the prevention doctrine, as the Indiana Court of Appeals has noted:

> [I]n *Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind. Ct. App. 1993), we recognized the rule that a party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure. When a party retains control over when the condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy the condition. *Id.* "The *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition." *Indiana State Highway Comm'n v. Curtis,* 704 N.E.2d 1015, 1019 (Ind. 1998).

*Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. App. 2000).  That doctrine applies to a condition precedent in a contract, which is "a condition that must be performed

12

A-12

before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises." *Curtis*, 704 N.E.2d at 1018. "Such conditions are generally disfavored and must be stated explicitly within the contract. *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 840 (Ind. App. 2015), *transfer denied,* 45 N.E.3d 1211 (Ind. 2016) (citing *Scott–Reitz Ltd. v. Rein Warsaw Assocs.,* 658 N.E.2d 98, 103 (Ind. App. 1995)); *see also Krukemeier v. Krukemeier Mach. & Tool Co.*, 551 N.E.2d 885, 889 (Ind. Ct. App. 1990) ("Conditions precedent are disfavored and must be stated explicitly."). "When the required action to be taken is an integral part of the contract, it is not a condition precedent." *Sasso*, 45 N.E.3d at 840. In this case, the Court is not convinced that the Agreement's requirement that Acheron obtain an FSS contract is, in fact, a condition precedent, rather than an "integral part of the contract." *Cf. Town of Plainfield v. Paden Eng'g Co.*, 943 N.E.2d 904, 915 (Ind. Ct. App. 2011) (noting that a condition precedent was created by the following language: "the Surety's obligation under this Bond shall arise after . . . ").

Even assuming that it is a condition precedent, as the parties appear to, the Court disagrees that the prevention doctrine imposed a duty on Cook to submit to the OIG audit. While Acheron cites to the Restatement (Second) of Contracts § 245 as support for its argument, the comment to § 245 states that "[t]he rule stated in this Section only applies, however, where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court." Similarly, Restatement (Second) of Contracts § 225, also cited by Acheron, makes it clear that "non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."

> When one party chooses to use the institution of contract to induce the other party to cause an event to occur, he may do so by making the event a condition of his own duty (Introductory Note to this Topic). Or he may do so by having the other party undertake a duty that the event occur. Or he may do both. But, as Subsection

13

A-13

> (3) makes clear, *a term making an event a condition of an obligor's duty does not of itself impose a duty on the obligee and the non-occurrence of the event is not of itself a breach by the obligee*. Unless the obligee is under such a duty, the non-occurrence of the event gives rise to no claim against him. The same term may, however, be interpreted not only to make an event a condition of the obligor's duty, but also to impose a duty on the obligee that it occur. And even where no term of the agreement imposes a duty that a condition occur, the court may supply such a term. See § 204.

*Id.* (emphasis added). This idea also is found in Williston's treatise, which notes that "there is no prevention when the conduct which allegedly prevented performance was permissible under the terms of the contract." 13 Williston on Contracts § 39:11 (4th ed.). To illustrate this principle, Williston cites to *Whitt v. Godwin*, 139 S.E.2d 841 (Va. 1965), which he summarizes as follows:

> Another case illustrating the principle that there is no prevention when the conduct which allegedly prevented performance was permissible under the terms of the contract dealt with a contract under which the plaintiff promised to relinquish his right to acquire the stock of a corporation in which the defendant was the principal stockholder in consideration of the defendant's promise to return the $12,000 which the plaintiff had paid toward the purchase price of the stock. The money had been paid to a mortgage company, and the defendant was having difficulty getting it back. He allegedly requested a release from the plaintiff, which was refused for various reasons. The court summarized the defendant's argument:
>
> > In his grounds of defense [the defendant] admitted the execution of the contract, but asserted that [the plaintiff] wrongfully prevented him from collecting $6,000 of the $12,000 which he sought from [the mortgage company]; that he was thus excused from performance of a portion of the contract, and that his liability to [the plaintiff] was limited to $6,000.
>
> The court then summarized the significant facts and rejected the defendant's argument, saying:
>
> > In the present case the terms of the written contract are clear and unambiguous. Under its provisions the only promise made by [the plaintiff] was to give up his right to acquire 248 shares of stock in [the corporation], in consideration of [the defendant's] promise to pay him $12,000 six months from [a specified date]. [The defendant's] promise to pay was absolute. It was neither expressly nor impliedly conditioned upon [the plaintiff's] signing a release so [the defendant] might obtain $6,000 from [the mortgage

14

A-14

> company]. Thus, [the plaintiff's] refusal to sign the release was not wrongful and in excess of his legal rights under the expressed or implied terms of the written contract. [The defendant's] failure to qualify his promise, so as to make the failure of [the plaintiff] to sign a release an available excuse for not paying $6,000 of the $12,000, rendered unavailable the alleged condition as a defense against a recovery for nonperformance.
>
> …
>
> … [I]t would reasonably appear that if it was intended that [the defendant's] payment of the $12,000 was conditioned upon [the plaintiff's] signing a release, the contract prepared at [the defendant's] direction would have been expected to include the said condition as a part of the written contract … It is thus apparent that [the defendant] assumed the risk, which was known to him when the contract was entered into.

*Id.*   So, too, in this case, the requirement that Acheron obtain an FSS contract is not qualified by a requirement that Cook submit to an OIG audit.  No such obligation on behalf of Cook is found in the Agreement, and the prevention doctrine does not create one.[9]

Acheron also suggests that the Indiana Commercial Code ("ICC") supplies the requisite duty.  Indiana Code § 26-1-1-203 provides that every contract governed by the ICC "imposes an obligation of good faith in its performance or enforcement."  However, this provision applies to "a specific duty or obligation under the contract," Comment to Uniform Commercial Code § 1-203; it does not create a duty where none exists.  *Cf. McArdle v. Peoria Sch. Dist. No. 150,* 705

---

[9]None of the cases cited by Acheron with regard to the prevention doctrine suggest otherwise.  Each of them involved the failure of a party to perform a duty that existed in the contract.  *See Rogier*, 734 N.E.2d 606 (contract created exclusive right to sell and therefore defendant had a duty not to hinder plaintiff's ability to make sale); *Hamlin v. Steward*, 622 N.E.2d 535 (Ind. App. 1993) (duty of fulfillment of condition precedent—sale of motel—rested in defendant, who therefore had a good faith effort to fulfill it); *AquaSource, Inc. v. Wind Dance Farm, Inc.*, 833 N.E.2d 535 (Ind. App. 2005) (same; condition precedent was requirement of approval by AquaSource's board, which AquaSource had a duty to make a good faith effort to bring about); *A.L. Maddox v. Wright*, 489 N.E.2d 133 (Ind. App. 1986) (plaintiff had duty to accept payoff from defendant and refusal to do so excused defendant's nonperformance); *Billman v. Hensel*, 391 N.E.2d 671 (Ind. App. 1979) (condition precedent was purchasers obtaining financing; purchasers failed to make good faith effort to do so).

A-15

F.3d 751, 755 (7th Cir. 2013) ("The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action. Nor does it permit a party to enforce an obligation not present in the contract."); *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (also applying Illinois law) ("Rather, the implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract.").  If the Agreement had imposed a duty on Cook to cooperate in an OIG audit, or assist Acheron in obtaining an FSS contract, then it would have had a duty to do so in good faith.  But no such obligation is placed on Cook by the Agreement.

Next, Acheron argues that "it is well settled under Indiana law that, unless the contract provides otherwise, all applicable law in force at the time of entry into the agreement impliedly forms a part of the agreement without any need for a statement to that effect."  Dkt. No. 67 at 23.  Acheron further invokes the *Christian* doctrine, pursuant to which applicable federal regulations are incorporated into federal contracts.  Thus, Acheron argues,

> 48 CFR § 515.408(b)(5) would have been read into any FSS contract between VA and Acheron in its role as reseller of Cook Medical's products. By the same token, those requirements must also be read into the Agreement between Cook Medical and Acheron, under which Acheron was to obtain an FSS to sell Cook Medical's products, and under which Cook Medical would directly reap benefits.

Dkt. No. 67 at 24.  Acheron cites no authority for the extension of the *Christian* doctrine beyond federal contracts to contracts between private parties that relate to federal contracts.  Further, as Cook points out, the regulation cited by Acheron did not place any obligation on Cook, as the party to be represented by Acheron.  Rather, they obligated Acheron, as a "dealer/reseller without significant sales to the general public," to obtain and provide certain information from

16

A-16

Cook in its application for an FSS contract. Therefore, while under Indiana law "[a]ny agreement between the parties must be considered in conjunction with applicable statutes that govern the relationship," the regulation at issue did not govern the relationship between Acheron and Cook, but rather Acheron's relationship with the VA.[10]

Finally, Acheron argues that Cook "waive[d] any right it had to refuse to cooperate with the VA OIG's request for information regarding its sales records" by "sign[ing] a written statement expressly authorizing the VA to have access to its sales records" and by Walters' statement to Acheron that "[w]e are good to go" with regard to the audit, followed by the two emails to officials of the VA, one dated January 27, 2015, and the other dated February 27, 2015, in which he expressed Cook's willingness to cooperate with the OIG audit. Dkt. No. 54 at 20-21. However, the Agreement did not give Cook the "right to withhold its cooperation with the audit"; rather, the Agreement did not obligate Cook to do so. Acheron therefore is not really arguing that Cook waived its rights under the Agreement; rather, it is arguing that Cook undertook additional obligations not set forth in the Agreement. However, the Agreement contains both an integration clause—thus barring any additional obligations being added by actions prior to its execution—and a provision that no amendment to it "shall be binding on the

---

[10]Acheron's argument that "[r]ead into the Agreement, Section 515.408(b)(5) made it mandatory for Cook Medical, as a matter of law, to allow the VA access to its sales records where, as here, (i) Acheron was a reseller representing its products, (ii) Acheron did not have significant sales to the general public, and (iii) the sales under the resulting FSS contract were expected to exceed $500,000" is simply incorrect. Dkt. No. 67 at 24. The regulation made it mandatory for VA to require certain information from Acheron before awarding it an FSS contract. It imposed no obligation on Cook to provide that information.

17

A-17

parties unless reduced to writing and duly executed by Cook and [Acheron]," Dkt. No. 1-1 at 9, which neither the written authorization[11] nor the emails from Walters satisfy.

In addition to the failure to cooperate with the OIG audit, Acheron alleges that Cook breached the Agreement by refusing to deactivate Cook's DAPA, thereby "effectively preventing Acheron from making any Endoscopy sales to the DOD through its own DAPA." Cook again points out that the Agreement does not require it to deactivate its own DAPA, and, indeed, contemplates that it would continue to sell directly to the DOD and the VA; it simply would be required to pay Acheron commission on those sales. While Acheron asserts that its sales to the DOD were to occur via its DAPA and distinguishes between those sales and sales to the VA by means of an FSS contract, the Agreement in fact does not provide for any payment of commission by Cook to Acheron (other than on Cook's own sales) until "[a]fter the date [Acheron] obtains its Federal Supply Schedule contract." Dkt. No. 1-1 at 5. Acheron argues that "acceptance of this extreme interpretation of the Agreement would effectively read a central provision—Article I, ¶ 1 appointing Acheron as exclusive distributor of Endoscopy products— out of the Agreement" and cites 2A C.J.S. Agency § 325 for the proposition that "[a] principal who grants an exclusive territory to an agent for the sale of the principal's products may not compete with the agent in selling the products in the territory." However, that same section also provides:

> A contract which creates an exclusive agency to sell will not be held to create an exclusive right to sell, thus prohibiting direct sale by the principal, unless the contract expressly confers such exclusive right upon the agent or contains other language indicating that the parties intended to prohibit a direct sale by the principal or to guarantee the agent a commission in the event of such a sale. Although the agency contract need not expressly designate the agency as an

---

[11]The parties dispute the date on which the written authorization was signed by Walters. There is no dispute, however, that it was not signed by Acheron and that it does not purport to be an amendment to the Agreement.

18

A-18

> exclusive agency, an intent to give an agent the exclusive right to sell in a territory must appear from unequivocal terms or by necessary implication.

2A C.J.S. Agency § 325 (footnotes omitted).  The Agreement in this case does not evince an intent to give Acheron the exclusive right to sell in the territory, thereby precluding direct sales by Cook.  To the contrary, the Agreement contemplates such direct sales will continue, expressly referring to commissions being based, in part, on the "selling party."  Dkt. No. 1-1 at 5.  It is this contract term that would be rendered superfluous if "exclusive distributor" were read to create an exclusive right to sell rather than just an exclusive agency to sell.

For the reasons set forth above, the Court finds that the Defendants are entitled to summary judgment on Acheron's breach of contract claim, both as it relates to the OIG audit and DAPA sales.  Accordingly, the Defendants' motion for summary judgment is **GRANTED**.

### B.  Acheron's Motion for Summary Judgment

Acheron's motion for summary judgment on its own breach of contract claims is **DENIED** in light of the Court's ruling above.

Acheron also moves for summary judgment on Cook's counterclaim against it for breach of contract.  Besides arguing that it is entitled to summary judgment on the counterclaim for the reasons already discussed in the context of Cook's motion for summary judgment, Acheron advances two additional arguments.  First, it points to the statement by Walters in his April 6, 2015, email that despite the fact that Acheron would no longer be pursuing an FSS for Cook's products, "As I stated on our last call, the contract remains in place and we will continue to consider business opportunities with Acheron under the terms and conditions of that agreement," Dkt. No. 55-6 at 3, and argues that "Cook Medical also relinquished its ability to terminate the Agreement based on Acheron's alleged 'breach' of its obligation to obtain an FSS when it elected to continue the Agreement after notifying Acheron that it had failed in that obligation and

19

A-19

that Cook Medical would no longer participate in efforts by Acheron to obtain an FSS to sell its products." Dkt. No. 54 at 24. Acheron fails to cite any cases that suggest that Indiana follows the principles cited by Acheron, as set forth in the Restatement (First) of Contracts § 309 and 5 Williston on Contracts § § 684, 687-88 (Rev. Ed. 1961). In any event, as described by Acheron, those principles apply to an "electing party [that] has continued to accept benefits under the contract." Dkt. No. 54 at 25. Acheron points to no benefits that Cook received under the contract after the April 6, 2015, email, nor does it explain what Walters could have meant by "the contract remains in place." Cook was under no obligation to pay Acheron any further commission under the Agreement unless and until it obtained an FSS for Cook's products, and there is no dispute that Acheron would not be doing so. Therefore, while Walters may have wanted to salvage some sort of relationship between the two parties, and while he might have believed that relationship could be governed by the Agreement, it could not.

Acheron also argues that once Cook elected to terminate the agreement, it then could not seek damages for its breach. That argument is without merit and is not supported by the case cited by Acheron. Rather, that case specifically notes that "[t]he doctrine of election of remedies applies only where a party has chosen one remedy and later pursues another remedy which is repugnant to or inconsistent with the remedy selected." *Parke v. First Nat. Bank of Elkhart*, 571 N.E.2d 1317, 1319 (Ind. App. 1991). Acheron does not explain how it would be inconsistent for Cook to seek damages caused by Acheron's breach after terminating the contract because of that breach. Accordingly, Acheron has not demonstrated that it is entitled to summary judgment on Cook's counterclaim.

20

A-20

## IV. CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment (Dkt. No. 53) is **DENIED**; the Defendants' motion for summary judgment (Dkt. No. 56) is **GRANTED**; the Plaintiff's Motion for Leave to Amend Its Appendix of Evidence in Support of Its Motion for Partial Summary Judgment (Dkt. No. 73) is **GRANTED** and the Clerk is directed to note on Dkt. No. 55 that it has been replaced by Dkt. No. 73; and the Defendants' motion to file a surreply (Dkt. No. 79) is **DENIED**.  The Court will request that Magistrate Judge Brookman meet with the parties to determine what remains to be done in this case, which now proceeds only as to the counterclaim, so that a new trial date can be set.

SO ORDERED: 9/28/17

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

21

A-21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ACHERON MEDICAL SUPPLY, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Cause No. 1:15-cv-1510-WTL-MPB |
| | ) |
| COOK INCORPORATED, et al., | ) |
| | ) |
| **Defendants.** | ) |

## JUDGMENT

The Court having granted summary judgment in favor of the Defendants on the

Plaintiff's claims, and, after a bench trial, having found in favor of the Counterclaim Defendant

on the counterclaim, judgment is hereby **ENTERED** in favor of the Defendants on all claims of

Plaintiff Acheron Medical Supply, LLC, and in favor of Counterclaim Defendant Acheron

Medical Supply, LLC, on the counterclaim of Cook Medical LLC.

SO ORDERED: 6/24/2019

Laura A. Briggs, Clerk

BY: _____
Deputy Clerk, U.S. District Court

_____
Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

A-22