**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

Appellate Case Nos. 19-2315 and 19-2410

---

ACHERON MEDICAL SUPPLY LLC )
                                                 )

    Plaintiff–Appellant/          ) Appeal from the United States District
    Cross-Appellee,              ) Court for the Southern District of Indiana
                                                 )
v.                                          ) Case No. 1:15-cv-01510-WTL-DLP
                                               )
COOK MEDICAL INCORPORATED ) District Judge William T. Lawrence
and COOK MEDICAL LLC,         )
                                               )
    Defendants–Appellees/      )
Cross-Appellants.             )

---

### DEFENDANTS-APPELLEES/CROSS-APPELLANTS' BRIEF

---

Anne L. Cowgur, Counsel of Record
Tammara D. Porter
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Phone: 317.713.3500

Attorneys for Defendants-Appellees/
Cross-Appellants,
Cook Medical Incorporated and Cook Medical LLC

26023419.3

CIRCUIT RULE  26.1 DISCLOSURE STATEMENT

Appellate Court Nos:  19-2315 & 19-2410

Short Caption:  Acheron Medical Supply, LLC v. Cook Medical Incorporated, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[     ]       PLEASE CHECK HERE  IF ANY INFORMATION ON THIS FORM  IS NEW OR REVISED AND INDICATE  WHICH   INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

~~Cook Medical LLC and Cook Medical Inc.~~

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Cook Medical LLC:  the sole member is Cook Group, Inc.    Cook Medical Inc.:  converted to Cook Medical LLC on or about January 1, 2014

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
N/A

Attorney's Signature:  /s/ Anne L. Cowgur          Date:  October    , 2019

Attorney's Printed Name:  Anne L. Cowgur

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes  X
                                                                                                            No _____

Address:   One Indiana Square, Suite 3500

        Indianapolis, Indiana 46204
Phone Number:  317.713.3437              Fax Number:  317.713.3699

E-Mail Address:  acowgur@taftlaw.com

i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court Nos: 19-2315 & 19-2410

Short Caption: Acheron Medical Supply, LLC v. Cook Medical Incorporated, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[    ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Cook Medical LLC and Cook Medical Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Cook Medical LLC:  the sole member is Cook Group, Inc.   Cook Medical Inc.:  converted to Cook Medical LLC on or about January 1, 2014

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: /s/ Tammara D. Porter          Date: October    , 2019

Attorney's Printed Name: Tammara D. Porter

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X
                                                                                              No _____

Address:  One Indiana Square, Suite 3500

          Indianapolis, Indiana 46204

Phone Number: 317.713.3509          Fax Number: 317.713.3699

E-Mail Address: tporter@taftlaw.com

ii

# TABLE OF CONTENTS

Circuit Rule 26.1 Disclosure Statement..................................................i

Table of Contents ................................................................... iii

Table of Authorities ................................................................. v

Jurisdictional Statement ............................................................. 1

Statement of the Issues .............................................................. 2

Statement of the Case ................................................................ 2

    I.  Origin of the dispute ......................................................... 2

    II. The Court grants summary judgment against Acheron and in favor of Cook Medical on Acheron's claim that Cook Medical breached the Distribution Agreement................................. 9

    III. The Court finds that Acheron breached the Distribution Agreement but imposes no liability for the breach ................................... 10

Summary of the Argument ......................................................... 12

Argument ......................................................................... 15

    Standard of Review........................................................... 15

    I.  The Court correctly held that Cook Medical did not breach the Distribution Agreement........................................... 15

        A. Cook Medical did not breach the Distribution Agreement in its decision not to undergo the OIG audit ...................................... 18

        1. The *force majeure* clause did not require Cook Medical to undertake the OIG audit ........................................... 18

        2. Any implied duty of good faith applies only to the existing obligations and does not create new obligations................................. 19

        3. Government regulations applicable to Acheron do not imply a duty by Cook Medical........................................................24

26023419.3

4. The prevention doctrine does not apply because Cook Medical did not "wrongfully" refuse to comply with the OIG audit ............................................................................................ 26

5. Indiana liberally construes the "election of remedies" doctrine to allow parties to pursue alternative remedies to a conclusion ......................................................................................... 27

B. Cook Medical did not breach the Distribution Agreement by continuing to make sales under its own DAPA .................................... 29

II. The District Court erred in holding that Acheron was excused from liability for its breach of contract .......................................................... 30

A. The *force majeure* clause did not relieve Acheron from liability for its breach ................................................................................. 31

B. Cook Medical was entitled to recoup its prepayments to Acheron as damages ...................................................................................... 33

Conclusion ...................................................................................................... 35

Certificate of Compliance .............................................................................. 36

Circuit Rule 30(d) Statement ....................................................................... 37

Certificate of Service ...................................................................................... 37

Appendix .......................................................................................................... 37

Table of Contents to Appendix ..................................................................... 37

iv

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012)...........................31

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504,
    84 L.Ed.2d 518 (1985).............................................................................................15

*Arbaugh v. Shockney*, 34 Ind. App. 268, 72 NE 668 (1904).......................................34

*Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889
    (Ind. Ct. App. 2001)..................................................................................................16

*Baxter Healthcare Corp. v. O.R. Concepts*, 69 F.3d 785, 790 (7th Cir. 1995)....................17, 20

*Biomet Inc. v. TACT Med. Instruments, Inc.*, 454 F.3d 653, 654 (7th Cir. 2006)..............20

*Cahoon v. Cummings,* 734 N.E.2d 535, 542 (Ind. 2000) ........................................27

*Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664 (Ind. 1997) .............................16

*First Federal Sav. Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990) .............16

*Fowler v. Campbell*, 612 N.E.2d, 596, 603 (Ind. Ct. App. 1993) .........................................33

*G.L. Christian & Assocs. v. U.S.*, 312 F.2d 481 (Ct. Cl. 1963) .........................................13, 25

*Hepburn v. Tri-Cnty. Bank*, 842 N.E.2d 378, 384 (Ind. Ct. App. 2006).............................15

*Hoover v. Hearth & Home Design Ctr., Inc.*, 654 N.E.2d 744, 745 (Ind. 1995).................27

*L.B. Foster Co. v. Tie & Track Sys.*, Case No. 07 C 3692,
    2009 U.S. Dist. LEXIS 26962, at * 17 (N.D. Ill. Mar. 31, 2009) .............................27

*L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 947 N.E.2d 1031, 1043
    (Ind. Ct. App. 2012).......................................................................................33, 35

*Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 763-64 (7th Cir. 2015)........................15

*McArdle v. Peoria Sch. Dist. No. 150*, 750 F.3d 751, 755 (7th Cir. 2013) .........................20

*Nat'l Labor Relations Bd. v. Local 554*, ("The Restatement (Second) of Contracts §
    245 (1979) ..................................................................................................27

*Parke v. First Nat'l Bank*, 571 N.E.2d 1317, 1319 (Ind. Ct. App. 1991)............................28

*R.T. Hepworth Co. v. Dependable Ins. Co., Inc.*, 997 F.2d 315, 318 (7th Cir. 1993)...............17

*Rain v. Rolls-Royce Corp.*; 626 F.3d 372, 379 (7th Cir.2010) ................................................15

*Roberts v. Cmty. Hosps. of Ind., Inc.*, 897 N.E.2d 458, 467 (Ind. 2008)............................16

*Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 620 (Ind. Ct. App. 2000) .............26

*Simon Prop. Group, L. P. v. Michigan Sporting Goods Distrib., Inc.*
 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005)..................................................................16

*State Farm Fire & Cas. Co. v. Riddell Nat'l Bank*, 984 N.E.2d 655
 (Ind. Ct. App. 2013), *trans. denied*.................................................................................31

*Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 531 (Ind. 2006)....................................16

*UPMC Braddock v. Perez*, 584 Fed. Appx. 1 (D.C. Cir. 2014) .................................................25

*Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 840 (Ind. Ct. App. 2015),
 *trans. Denied*, 45 N.E.3d 1211 (Ind. 2016)...................................................................26

*Wisconsin Elec. Power Co. v. Union Pac. R. Co.*, 557 F.3d 504
 (7th Cir. 2009)....................................................................................................................31

*Wood v. Lucy, Lady Duff-Gordon*, 22 N.Y.88 (1971)..................................................................16

**Statutes**

28 U.S.C. § 1291 .......................................................................................................................1

28 U.S.C. § 1332 .......................................................................................................................1

Indiana Code section 26-1-1-203 .........................................................................................19

Uniform Commercial Code § 1-203.......................................................................................20

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014)........................................................................32

**Rules**

32 A.L.R. 3d 802.......................................................................................................................34

C.F.R. § 515.408(b)(5)..............................................................................................................24

Fed.R.App. 3 and 4...................................................................................................................1

Fed.R.Civ.P. 52(a).....................................................................................................................15

## Jurisdictional Statement

The jurisdictional summary in Appellant's Brief ("Br.") is complete and correct as to the citizenship of Cook Medical, LLC and its predecessor Cook Medical, Inc. On information and belief, that statement is also correct as to the citizenship of Acheron Medical Supply LLC and its members. Although damages are disputed, both parties are claiming damages in excess of $75,000, and the District Court properly exercised jurisdiction under 28 U.S.C. § 1332. [Appellant's Br. p. 1.]

The Appellant has also accurately summarized the basis for this Court's jurisdiction over its appeal from the Court's final judgment in this case. On July 25, 2019, Cook Medical timely filed a Notice of Appeal initiating its cross-appeal. For its cross-appeal, Cook Medical seeks review of: (1)the portions of the June 24, 2019 Findings of Fact and Conclusions of Law Following Bench Trial [APPX-1 to APPX-7], which held that Acheron's breach of the Distribution Agreement was excused by the force majeure clause in the Agreement, that Cook Medical was not entitled to the repayment of the commissions it paid to Acheron under the Agreement and, therefore, on these grounds found in favor of Acheron and against Cook Medical on Cook Medical's counterclaim; and (2) the portion of the June 24, 2019 Judgment [Dkt. #149], which found in favor of Counterclaim Defendant Acheron Medical Supply, LLC on the counterclaim of Cook Medical LLC. This Court has jurisdiction over Cook Medical's cross-appeal under 28 U.S.C. § 1291, and Fed.R.App. 3 and 4.

1

## Statement of the Issues

1.      Whether the District Court correctly declined to find Cook Medical had contractual obligations not expressed in the parties' integrated written agreement and entered summary judgment in favor of Cook Medical and against Acheron on Acheron's claims for breach of contract based on its findings that Cook Medical did not breach the Distribution Agreement.

2.      Whether the District Court erred in holding that, although Acheron breached a material obligation of the Distribution Agreement, the *force majeure* clause in the Distribution Agreement relieved Acheron from liability to Cook Medical for Acheron's breach of the Distribution Agreement and/or that Cook Medical was not entitled to recover amounts paid to Acheron under the Distribution Agreement despite Acheron's breach.

## Statement of the Case

### I.      Origin of the dispute

Beginning in 2013, Cook Medical and Acheron, primarily through Ron Walters and John Wesley (Wes) Pate, respectively, began discussing a potential business relationship in which Acheron would assist Cook Medical in contracting government sales of Cook Medical's products to the Department of Defense and the Department of Veterans Affairs. [Dkt. #158, Trial Tr. at p. 24.]  Walters, an employee in sales with Cook Medical, had just started working in the government segment of Cook Medical's sales in 2013.  [*Id.*, at p.22.]  Acheron represented to Cook Medical that it had "over 30 years of cumulative experience selling to the

2

Government in various business sectors." [Dkt. #166, Trial Ex. 9, at p.2.] The primary focus of the communications between Walters and Pate centered on getting Cook Medical's products on the Federal Supply Schedule ("FSS") within the VA. [Dkt. #158, Trial Tr. at p.24.] "The FSS is one type of Multi-Award Schedule contract that the VA enters into with suppliers covering the sale of goods and services to the VA." [APPX-2.] The discussions between Cook Medical and Acheron were focused on the FSS because, at that time, the FSS was a mandatory source contract that was intended to take priority over other types of contracts within the VA.[1] [Dkt. #158, Trial Tr. at p.25.]

On July 23, 2014, Cook Medical and Acheron entered a Distribution Agreement. [Dkt. #166, Trial Ex. 15.] Under the terms of the Distribution Agreement, Acheron was obligated to obtain an FSS and to use that FSS contract to sell Cook Medical's products. [*Id.*, Trial Ex. 15, Art. V, ¶ 2.] In addition to specifically stating that Acheron "will obtain a Federal Supply Schedule contract and use it to sell the products," the Distribution Agreement specifically refers to the FSS in several other provisions, including the express requirement that "[o]nce [Acheron] is awarded its Federal Supply Schedule contract, it must increase sales for each business unit on its Federal Supply Schedule based on the schedule below." [*Id.*, Art. IX, ¶ 3] The Distribution Agreement also provided that "Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase

---

[1] Because the FSS was considered to be a mandatory source contract, purchasers within the VA healthcare system were supposed to look to the FSS first, where applicable. However, physicians and clinicians within the VA had flexibility to purchase from other suppliers through open market sales based on a variety of considerations including pricing and preferences. [Dkt. #158, Trial Tr. at pp. 25-26.]

26023419.3

price on all Endoscopy Products sold by [Cook] in the territory [defined in the Agreement as being the VA and the DOD] between March 1, 2014 and the date [Acheron] obtains its Federal Supply Schedule contract, provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year." [*Id.* Art. V, ¶ 3.] The Distribution Agreement contemplates that Cook Medical would continue making direct sales to the DOD and VA throughout the contract insofar as Exhibit A to the Distribution Agreement sets forth a commission schedule governing the commission to be paid to Acheron after it received its FSS "on products that are approved on its [FSS] contract at the time of the sale," including commissions to be paid to Acheron after it obtained its FSS on any direct sales by Cook Medical to the DOD and the VA. [*Id.* at its Ex. A.] Although Acheron contends that other factors such as potential for small business set-aside and a potential veteran-owned business affiliation were relevant to the business relationship between Acheron and Cook Medical, the Distribution Agreement does not mention these factors or establish rights or obligations for either party related to such factors. [*See generally* Dkt. #166, Tr. Ex. 15.]

The Distribution Agreement also contains an integration clause, providing "[t]his Agreement and any instrument, document, plan or procedure incorporated into this Agreement by reference shall constitute the entire Agreement between the parties as to the subject matter hereof and supersedes all prior oral or written agreements as to such subject matter." [*Id.*, Art. X, ¶ 10.] It further provides that "[n]o amendment, modification, or addition to this Agreement shall be binding on the parties unless reduced to writing and duly

26023419.3

executed by [Cook] and [Acheron]." [*Id.* at¶ 2] "For purposes of serving notices, requesting approvals, granting authorizations, or transmitting any correspondence related to [the Distribution] Agreement," notice was required to both Ron Walters and the General Counsel of Cook Group Incorporated. [*Id.,* Art. X, ¶ 5.]

Although Cook Medical was interested in having its products on an FSS, it had concerns about the process for obtaining such a contract and that, given Cook Medical's size and the sales it had, the application process would be long and arduous. [Trial Tr. at 74.] Acheron represented that if it applied for the FSS as a reseller of Cook Medical's products, it could use Cook Medical's pricing from Cook Medical's Distribution and Pricing Agreement ("DAPA") as the price point for negotiating the FSS.[2] [Dkt. #158, Trial Tr. at p. 75.] The Distribution Agreement provided that the price Acheron would pay for Cook Medical's products for distribution would be the price for products that Cook Medical charged to customers in "the Territory," defined in the agreement as the DOD and VA [Dkt. #166, Tr. Ex. 15, at Art. V, ¶ 1.] Cook Medical was wary of Acheron's proposed strategy, [Dkt. #158, Trial Tr. at p. 76], and as it turned out, Cook Medical's concerns were justified.

On June 2, 2014, when Pate requested Cook Medical's commercial price list, Walters asked why Cook Medical's commercial pricing was being requested

---

[2] Elsewhere Acheron suggests that Cook Medical should have discontinued its DAPA sales and allowed Acheron to make these sales to establish sales and pricing for the FSS. However, the Distribution Agreement does not contain any reference to this arrangement. Further, given the short time that had elapsed between Acheron's efforts to load the endoscopy products on its DAPA and the submission of the application for the FSS, Acheron would not have had time to establish a record of substantial sales, let alone substantial sales in the private sector, to set a pricing history that would have avoided the OIG audit request to Cook Medical.

26023419.3

when Acheron was the contracting party. [Dkt. #166, Tr. Ex. 16.] Pate responded that the contracting officer just wanted to be sure that Cook Medical's and Acheron's commercial price lists match. [*Id.*] On July 28, 2014, the contracting officer wrote to Pate to instruct him "again" that he needed a letter of authorization from Cook Medical, signed by an officer of Cook Medical, granting access to all commercial pricing. [*Id.*, Tr. Ex. 20.] Pate did not forward this request to Walters, let alone to the General Counsel of Cook Group Incorporated, as required by the Distribution Agreement notice provision. [Dkt. #159, Trial Tr. at p. 328.] Acheron contends that it provided the authorization letter the contracting officer had requested. [Br. p. 11.] However, at most, Pate fashioned a letter for Walters' signature that stated that Cook Medical would provide the VA with access to "those sales records between Cook and Acheron Medical Supply, [Cook's] contracted vendor for medical devices purchased by the VA Medical Centers, and all other needed records to support this contract award," with the caveat that "[t]he sole purpose of providing access to this information will be to verify information submitted by the Dealer/Reseller (Acheron Medical Supply) to the Veterans Administration." [Dkt. #166, Tr. Ex. 21.] Not only does this letter make no reference to commercial sales records, but also Walters is *not* an officer of Cook Medical and never has been. [Dkt. #158, Trial Tr. at p. 22.]

On August 14, 2014, Walters received a letter from the Office of Inspector General ("OIG") of the VA seeking an audit of Cook Medical's Commercial Sales Practices. [Dkt. #166, Tr. Ex. 31.] Preliminarily, the OIG was requesting "all domestic sales transactions, FSS and non-FSS (direct and indirect, including

6

chargeback data, if applicable) from February 1, 2014 through July 31, 2014," in a format designated by the OIG. [*Id.*] Further, the OIG itemized eleven other categories of documents required, including a list of all customers that received rebates or administrative fees for a 6-month period, as well as any and all promotions in effect during the 6-month period. [*Id.*] The letter clearly indicated that even after this "preliminary" information was supplied, additional information may be requested. [*Id.*] Much of the information the OIG was requesting either did not exist or was not maintained in a format that was readily accessible and/or complete. [Dkt. #57-8 at ¶¶ 7-11.] Cook Medical estimates that it would require at least 37 to 52 full time employee days to provide even the information Cook Medical could provide, and likely more. [*Id.* at ¶ 13.] Moreover, the OIG audit and its focus was contrary to what Cook Medical had expected; although Pate claimed that he had discussed this requirement with Walters, the District Court as the finder of fact, having heard conflicting testimony on this issue found that Cook Medical had not anticipated that it would have to provide the extensive information required by the VA in order for Acheron to obtain an FSS and that Walters was "shocked" by the OIG's request. [APPX-2 to APPX-3.]

Moreover, Cook Medical had concerns that if pricing under the FSS was to be negotiated based on the pricing audit rather than on DAPA pricing as represented by Acheron, the Distribution Agreement would become unworkable. [Dkt. #158, Trial Tr. at pgs. 45-46 and 191-192.] The Distribution Agreement called for Cook Medical to sell product to Acheron at the price Cook Medical was

26023419.3

charging to the DOD and VA (in "the Territory") and then to pay Acheron an 8-percent commission on those sales. [Dkt. #166, Tr. Ex. 15 at Art. II ¶ 1, Art. V ¶ 3 and Ex A to Tr. Ex. 15.] If this extensive and burdensome commercial pricing audit followed by negotiation of pricing under the FSS led to lower pricing than what Cook Medical was currently charging to the DOD and the VA, any FSS sales could result in losses for both Acheron and Cook Medical, making the Distribution Agreement unworkable.

Cook Medical was hesitant to undertake the burden of a full commercial pricing audit and had concerns about Acheron in light of the previous representations. [Dkt. #57-5 at 184:1-10.] Walters was trying to assuage internal concerns at Cook Medical about the audit and indicated to Pate and others that Cook Medical was willing to proceed with the audit; but in or around March 2015, David Breedlove determined that the audit request was too burdensome and was fundamentally different from what Acheron had led Cook Medical to believe would be required and that he had lost confidence in Acheron and its claimed government expertise. [*Id.*] However, Walters continued to try to find a way to work with Acheron in some capacity, stating, "I really like you guys and sincerely want to see you succeed." [Dkt. #55-6 at pg. 3.] However, it became apparent based on communications from Frank Lauch, an investor in Acheron, that a mutually agreeable working relationship was unlikely. [Dkt. #166, Tr. Exs. 55 & 58.]

On July 1, 2015, Cook Medical notified Acheron that Acheron was in breach of its contract due to, among other things, Acheron's inability to obtain

26023419.3

the FSS and to use it to sell Cook Medical's products. [*Id.*, Tr. Ex. 14, at p. 3.][3] The Distribution Agreement provides that Cook Medical may terminate the Distribution Agreement effective immediately upon written notice to Acheron of the occurrence of a material breach by Acheron of any of its essential obligations contained in the Agreement, which is not cured by Acheron within thirty days after receiving written notice of the breach from Cook Medical. [*Id.*, Tr. Ex. 15, at Art. IX ¶ 2.] Acheron was unable to obtain the FSS; thus, the breach remained uncured and the Distribution Agreement terminated by its terms.

On September 25, 2015, Acheron filed suit against Cook Medical claiming that Cook Medical breached the Distribution Agreement due to Cook Medical's refusal to undergo the OIG audit and its continuation of sales to the DOD under the Cook Medical DAPA agreement. [Dkt. #1.] On December 7, 2015, with its answer to Acheron's Complaint, Cook Medical asserted a counterclaim seeking to recover damages due to Acheron's breach of the Distribution Agreement. [Dkt. #15.]

**II. The Court grants summary judgment against Acheron and in favor of Cook Medical on Acheron's claim that Cook Medical breached the Distribution Agreement.**

On October 12, 2016, both Acheron and Cook Medical filed motions for summary judgment. Acheron sought summary judgment on its claims and on Cook Medical's counterclaims. [Dkt. #53-56.] Cook Medical sought summary

---

[3] The termination letter also references Acheron's failure to use its best efforts to promote, solicit and expand the sale of Cook Medical's products within the territory defined under the Distribution Agreement. [Dkt. #166, Tr. Ex. 14, at 3.] Trial evidence showed that Cook Medical missed an opportunity for more than a million dollars in sales due to Acheron's failure to supply requested information with respect to a solicitation from the Strategic Acquisition Center for the sale of medical forceps. [Dkt. #158, Trial Tr. at 35-36.]

26023419.3

judgment on Acheron's claims only. [Dkt. #56 and 57.] On September 28, 2017, the Court entered its Entry on Motions for Summary Judgment and Related Motions. [Dkt. # 91.] The Court applied Indiana law and examined the plain language of the unambiguous Distribution Agreement. [Dkt. #91, at pgs. 10-11.] In so doing, the Court found that the Distribution Agreement neither required Cook Medical to undergo the OIG audit nor to discontinue its own DAPA sales. [Dkt. #91, at pgs. 15, 18 - 19.] The Court rejected Acheron's attempts to create or imply this duty for Cook Medical on the same legal theories Acheron asserts on appeal. [*See generally* Dkt. #91.] The Court granted summary judgment in favor of Cook Medical on Acheron's claims and denied Acheron's motion for summary judgment. [Dkt. #91, at p. 21.]

Following the summary judgment entry, the case proceeded only as to Cook Medical's counterclaims. [Dkt. #91, at p. 21.] Acheron filed a motion to reconsider, asking the Court to find that the *force majeure* clause in the Distribution Agreement required the dismissal of Cook Medical's counterclaims. [Dkt. #92.] On April 17, 2018, the Court denied the motion to reconsider. [Dkt. #101.]

### III. The Court finds that Acheron breached the Distribution Agreement but imposes no liability for the breach.

On April 23 and 24, 2019, Cook Medical's counterclaim against Acheron was tried to the Court. The Court heard evidence supporting its conclusion that "Cook had not anticipated that it would have to provide the extensive information required by the VA in order for Acheron to obtain an FSS; in fact Ron Walters testified that he was shocked to learn that it was being requested." [APPX-3.] In

26023419.3

addition to the plain language of the Distribution Agreement, which repeatedly refers to Acheron obtaining the FSS for the sale of Cook Medical's products, the Court heard testimony from Walters that obtaining the FSS was the focus of the business relationship with Acheron. [Dkt. #158, Trial Tr. at pgs. 24, 38 and 52-53.] Further, the parties stipulated [Dkt. #135], that Cook Medical paid to Acheron $116,317.81 pursuant to Article V, paragraph 3 of the Distribution Agreement, which provided: "Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase price on all Endoscopy Products sold by [Cook] in the Territory [defined in the Agreement as being the VA and the DOD] between March 1, 2014 and the date [Acheron] obtains its Federal Supply Schedule contract, *provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year.*" [Dkt. #166, Tr. Ex. 15, at Art. V, ¶ 3 (emphasis added).]

Cook Medical conceded at trial that it could not establish with sufficient certainty the full measure of the damages it incurred from being deprived of the benefit of its bargain with Acheron due to Acheron's failure to obtain the FSS. However, the $116,317.81 paid to Acheron under the provision that called for such payments to be made "provided" Acheron obtained the FSS, is a quantifiable and actual damage to Cook Medical. That is the damage Cook Medical sought on its counterclaim.

At the close of the presentation of evidence, the Court ordered the parties to submit proposed findings of fact and conclusions of law. On May 15, 2019, both parties submitted proposed findings and conclusions. [Dkt. #138 and 141.] On June 24, 2019, the Court entered its Findings of Fact and Conclusions of

11

Law Following Bench Trial [APPX-1 to APPX-7.] In its June 24, 2019 Findings of Fact and Conclusions of Law Following Bench Trial, the Court found "that Acheron's inability to obtain an FSS constitutes a material breach of the Agreement, but that, by operation of the force majeure clause in the Agreement, Acheron is not liable to Cook for that breach." [APPX-7.] Alternatively, the Court found that "even if the force majeure clause did not apply, Cook would not be entitled to repayment of the commissions it paid to Acheron under the Agreement." [*Id.*] On these grounds, the Court found in favor of Acheron and against Cook Medical on Cook Medical's counterclaims. [*Id.*][4]

On the same day, the Court entered final judgment in this case [Dkt. #149], and this appeal and cross-appeal ensued.

### Summary of the Argument

The Court, on summary judgment, correctly held that Cook Medical did not breach the Distribution Agreement by determining that it would not undergo an extensive commercial pricing audit by the OIG. The integrated Distribution Agreement does not obligate Cook Medical to undertake this audit and is silent on the issue. The District Court correctly adhered to the four corners rule of construing an unambiguous contract under Indiana law.

Acheron eschews the Indiana contract law as outdated, and dedicates its arguments to various attempts to imply an obligation on Cook Medical on an

---

[4]    In the days leading up to trial it became apparent that Acheron wanted to use the trial of Cook Medical's counterclaims to reargue the summary judgment order dismissing its claims against Cook Medical. The Court rejected that approach. [Dkt. #125 and 134.] Also, on June 20, 2019, the Court denied Acheron's post-trial motion to vacate the summary judgment order. [Dkt. #147.]

issues about which the parties' integrated written agreement is silent.  However, none of these extra-contractual theories is supported in law or fact.

First, Acheron seeks to imply a duty to comply with the audit under the Indiana Commercial Code requirement of good faith and fair dealing.  But, this principle applies only to require good faith and fair dealing in carrying out the existing obligations under the contract and not to imply additional duties beyond the contract terms.

Acheron also tried to impose a duty on Cook Medical based on a tortured interpretation of the *force majeure* clause, rejected by the District Court. As the party affected and unable to perform, Acheron had the sole duty to remove the condition impeding performance.  There is no corresponding allegation that Cook Medical could not perform its express obligations under the Distribution Agreement.

Acheron also seeks to create an unwritten obligation for Cook Medical based on federal regulations and law.  However, Acheron's arguments fail because the relevant regulations and the *Christian* doctrine operate to make Acheron accountable as the contracting party and cannot be used to create an obligation for Cook Medical.

Acheron further argues that the prevention doctrine and election of remedies excuse its performance, but Acheron's arguments are not supported by Indiana law.  Indiana law generously allows plaintiffs to elect alternate and conflicting remedies so long as they do not lead to duplicative recovery after trial. And, the "prevention doctrine" applies only to wrongful conduct.  Thus, Acheron

13

cannot rely on the prevention doctrine to declare a breach and then declare Cook Medical's conduct "wrongful," under the doctrine

While Cook Medical contends that the District Court correctly granted summary judgment and dismissed Acheron's claims, the District Court erred in absolving Acheron of liability for its breach on Cook Medical's counterclaim. The District Court correctly held that Acheron breached a material obligation of the Distribution Agreement when Acheron was unable to obtain the FSS. The District Court, hearing and weighing the evidence as the trier of fact, correctly found that Cook Medical did not anticipate undergoing the OIG audit to assist Acheron in obtaining the FSS. However, the District Court incorrectly absolved Acheron of liability for its breach on two grounds.

First, the District Court found that the *force majeure* clause in the Distribution Agreement excused Acheron's non-performance. Not only does such analysis render Acheron's performance under the contract illusory, but further it ignores Acheron's claimed expertise in government contracting and its reliance in this case on contracting regulations. Second, the District Court determined that Cook Medical was not entitled to recoup payments made under the parties' contract which were contingent on Acheron obtaining the FSS. Even if the purpose of such payments is phrased as a goal or an incentive, the fact remains that Cook Medical made payments to Acheron contingent on Acheron obtaining an FSS, and Acheron did not fulfill that promise and obligation.

For all of the reasons stated above, the Court should affirm the summary judgment Order against Acheron and reverse the judgment against Cook

14

Medical, reversing and remanding to award Cook Medical the damages proved at trial.

**Argument**

**Standard of Review**

Acheron correctly asserts that this Court engages in a *de novo* review of a District Court's entry on summary judgment. However, following a bench trial, as the District Court held on Cook Medical's counterclaim, this Court reviews the District Court's legal conclusions *de novo* and its factual findings for clear error. *Rain v. Rolls-Royce Corp.*; 626 F.3d 372, 379 (7th Cir.2010). "[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting Fed.R.Civ.P. 52(a)) (internal quotation marks omitted).

**I.    The Court correctly held that Cook Medical did not breach the Distribution Agreement.**

As the District Court noted, the Distribution Agreement provides and the parties agreed that Indiana law governs the disputes in this case. [Dkt. #91, at p. 10.] Further, neither party argued that the Distribution Agreement was ambiguous. [Dkt. #91, at p. 11.]

Indiana Courts do not "add provisions to a contract that were not placed there by the parties." *Hepburn v. Tri-Cnty. Bank*, 842 N.E.2d 378, 384 (Ind. Ct. App. 2006); *see also Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 763-64 (7th Cir. 2015)(citing *Hepburn* with approval); *Simon Prop. Group, L. P. v.*

26023419.3

*Michigan Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005)(citing *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001)). This Court's "power to interpret contracts does not extend to changing their terms." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 669 (Ind. 1997). "Indiana follows 'the four corners rule' that 'extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction.'" *Roberts v. Cmty. Hosps. of Ind., Inc.*, 897 N.E.2d 458, 467 (Ind. 2008), quoting *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 531 (Ind. 2006).

"It is not the province of courts to require a party acting pursuant to such a contract to be 'reasonable,' 'fair,' or show 'good faith' cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties. . . . The proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them." *First Federal Sav. Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990).

In the District Court, Acheron criticized this basic tenet of Indiana contract law as "a maximalist position [that] perhaps might have had currency in the 19th century," and cited *Wood v. Lucy, Lady Duff-Gordon,* 22 N.Y.88 (1971) to argue that "the law has long since moved beyond that." However, the District Court correctly held, "'[p]rimitive' or not, Indiana law still very much eschews the

16

practice of courts inferring duties that the parties have not included in their unambiguous contracts." [Dkt. #91, at p. 12.][5]

Further, the parties' Distribution Agreement contains an integration clause that disclaims reliance on any written or oral representation made outside of the terms of the Distribution Agreement. [Tr. Ex. 15, at Art. X, ¶ 10.] Moreover, the Distribution Agreement contains a provision that prohibits modification of the Distribution Agreement absent proper notice under the agreement and a modification in writing executed on behalf of both parties. [Tr. Ex. 15, at Art. X, ¶ 5.]

It is undisputed and indisputable that the Distribution Agreement does *not* contain a provision stating that Cook Medical would submit to a commercial pricing audit by the OIG. [*See generally* Dkt. #166, Tr. Ex. 15.] Similarly, there is no provision in the Agreement that requires Cook Medical to discontinue sales to the DOD under its DAPA. [*See generally Id.*] In fact, as shown below, the Distribution Agreement expressly contemplated that Cook Medical would continue to make sales to the DOD and the VA. The District Court was correct in adhering to Indiana law and refusing to create an obligation for Cook Medical that did not exist in the parties' integrated written agreement.

---

[5] Acheron relies heavily on cases from Illinois in its effort to imply obligations on Cook Medical that are not stated in the Distribution Agreement. However, Indiana law applies in this case. While Indiana applies the four corners rule of contract interpretation, this Court has previously recognized that Illinois has largely rejected the traditional "four corners rule," which holds that if a contract is clear "on its face," no other evidence may be introduced to contradict its terms. *R.T. Hepworth Co. v. Dependable Ins. Co., Inc.*, 997 F.2d 315, 318 (7th Cir. 1993). Furthermore, even Illinois law ascribes to the proposition that "if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another term to the agreement." *Baxter Healthcare Corp. v. O.R. Concepts*, 69 F.3d 785, 790 (7th Cir. 1995).

26023419.3

**A. Cook Medical did not breach the Distribution Agreement in its decision not to undergo the OIG audit.**

Having negotiated a contract that is wholly silent as to any obligation by Cook Medical to undertake a substantial commercial pricing audit, Acheron seeks to have a court pencil that obligation into the Distribution Agreement in contravention of long-standing Indiana precedent. Acheron tries to imply an unwritten and substantial obligation upon Cook Medical through a variety of novel legal arguments, none of which can succeed when the applicable law and facts are considered.

**1. The *force majeure* clause did not require Cook Medical to undertake the OIG audit.**

In the absence of a provision in the Distribution Agreement that required Cook Medical to participate in the OIG audit, Acheron relies on a tortured reading of the *force majeure* clause found at Article X, paragraph 4 of the Distribution Agreement. The relevant language states: "Neither Cook nor any Affiliate nor Distributor shall be liable for any delay or default caused by force majeure, including without limitation . . . act of government or . . . agency . . . . The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible." [Dkt. #166, Tr. Ex. 15 at Art. X, ¶ 4.]

As further explained below, Cook Medical questions whether the requirement of an OIG audit can be a "force majeure," under these circumstances. However, even if the audit requirement qualifies as a "force

26023419.3

majeure," it cannot be read to require Cook Medical to undertake obligations not included in the parties' written, integrated contract.

As an initial matter, the *force majeure* clause is an exculpatory clause that forgives a temporary inability to perform a requirement under the contract. It bears repeating here that under the plain terms of the Distribution Agreement, Cook Medical had no obligation to perform with respect to the OIG audit. If the Distribution Agreement included a provision requiring Cook Medical to undergo the commercial pricing audit, the *force majeure* clause, if it applied, would have excused Cook Medical from any claim of breach for any delay or default resulting from difficulties in carrying out such obligation. The evidence shows that there may well have been delays and difficulties given the information requested as compared to the records available within Cook Medical. [Dkt. #57-8 at ¶¶ 7-11.]

As the District Court correctly noted, "[i]t was Acheron's ability to perform its obligation under the contract that was caused by the government action [of requiring the commercial pricing audit], and therefore it was Acheron, not Cook [Medical] that was the 'party affected' and on whom the force majeure clause imposed a duty" to "use every reasonable effort to correct the cause which prevents performance and resume performance as soon as possible." [Dkt. #91, at p. 11; Dkt. #166, Tr. Ex. 15 at Art. X, ¶ 4.]

### 2. Any implied duty of good faith applies only to the existing obligations and does not create new obligations.

Assuming that the Distribution Agreement is governed by the Indiana Commercial Code, Acheron argues that Indiana Code section 26-1-1-203

19

"imposes an obligation of good faith in its performance or enforcement." However, this provision applies to "a specific duty or obligation under the contract." Cmt. to Uniform Commercial Code § 1-203. There is a dearth of Indiana case law interpreting the "good faith" requirement. However, other courts applying similar provisions have held that the duty to act in good faith does not create obligations not present in the contract, but rather merely requires good faith in the execution of duties present in the contract. *See, e.g., McArdle v. Peoria Sch. Dist. No. 150*, 750 F.3d 751, 755 (7th Cir. 2013)("The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action. Nor does it permit a party to enforce an obligation not present in the contract."); *Baxter Health Care*, 69 F.3d at 792 ("the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract" but rather "the covenant merely guides the construction of the explicit terms in the agreement.").

Acheron also relies on cases from other jurisdictions. However, Acheron relies on cases in which the courts implied the duty of good faith and fair dealing to an existing contract term. For example, in *Biomet Inc. v. TACT Med. Instruments, Inc.*, 454 F.3d 653, 654 (7th Cir. 2006), this Court addressed a contract provision that required the "return" of the products to be repurchased and merely omitted the location of the return. If the Distribution Agreement required Cook Medical to submit to the audit and this case was a dispute about whether Cook Medical acted in good faith in carrying out its express obligation, then such cases would be instructive.

20

Furthermore, the evidence belies Acheron's suggestion that Cook Medical was not acting in good faith when it decided it would not undertake the OIG audit. Concepts of commercial reasonableness and applying the intent of the parties do not support a finding that Cook Medical should have undertaken this obligation under the circumstances. The District Court, as the trier of fact and having heard all of the evidence, held that Cook Medical "had not anticipated that it would have to provide the extensive information required by the VA in order for Acheron to obtain an FSS." [APPX-2.] Acheron's counsel on cross-examination of Walters suggested that the intent of the parties was for Acheron to be able to use Cook Medical's DAPA pricing as pricing justification for the FSS. [Dkt. #158, Trial Tr. at p. 78.]

Acheron's claim that it had "obtained Cook Medical's consent to provide access to the very Cook Medical[] sales records that the OIG was seeking in its August 14, 2014 letter," ignores the evidence presented at trial. On June 2, 2014, when Pate requested Cook Medical's commercial price list, Walters asked why Cook Medical's commercial pricing was being requested when Acheron was the contracting party. [Dkt. #166, Tr. Ex. 16.] Pate responded that the contracting officer just wanted to be sure that Cook Medical's and Acheron's commercial price lists match. [*Id.*] On July 28, 2014, the contracting officer wrote to Pate to instruct him "again" that he needed a letter of authorization from Cook Medical, signed by an officer of Cook Medical, granting access to all commercial pricing. [Dkt. #166, Tr. Ex. 20.] Pate did not forward this request to Walters, let alone to the General Counsel of Cook Group Incorporated, as required by the

21

Distribution Agreement notice provision. [Dkt. #159, Trial Tr. at p. 328.] Instead, Pate fashioned a vague letter for Walters' signature that stated that Cook Medical would provide the VA with access to "those sales records between Cook and Acheron Medical Supply, [Cook's] contracted vendor for medical devices purchased by the VA Medical Centers, and all other needed records to support this contract award," with the caveat that "[t]he sole purpose of providing access to this information will be to verify information submitted by the Dealer/Reseller (Acheron Medical Supply) to the Veterans Administration." [Dkt. #166, Tr. Ex. 21.] Not only does this letter make no reference to commercial sales records, but also Walters is *not* an officer of Cook Medical and never has been. [Dkt. #158, Trial Tr. at p. 22.] Acheron did not obtain Cook Medical's consent to provide access to all of its commercial pricing information; rather, Pate concealed the request and disregarded Walters' concerns that such information was being requested.

Acheron touted its 30 years of government contracting experience when selling itself to Cook Medical as a government distributor. [Dkt. #166, Trial Ex. 9, at p.2.] While the Distribution Agreement made no mention of an OIG audit, it did provide that "[f]or purposes of serving notices, requesting approvals, granting authorizations, or transmitting any correspondence related to [the Distribution] Agreement," notice was required to both Ron Walters and the General Counsel of Cook Group Incorporated. [Dkt. #166, Tr. Ex. 15 at Art. X, ¶ 5.] It is undisputed that Pate did not send the contracting officer's request to Cook Medical. [Dkt. #159, Trial Tr. at p. 328.] Under these circumstances, if

26023419.3

the Court is inclined to consider good faith in the context of the requested audit, Acheron's own conduct is relevant to determining whether Cook Medical was acting in bad faith.

Finally, Acheron's suggestions that Cook Medical took "opportunistic advantage" of Acheron's inability to obtain the FSS without an audit or the suggestion of "parlor games" ignores the reality that Cook Medical's primary focus in working with Acheron was to put Cook Medical's products on an FSS without enduring the long and arduous process of obtaining its own FSS. [Dkt. #158, Trial Tr. at p. 74.] Under the Distribution Agreement, Acheron was obligated to increase Cook Medical's sales to the DOD and the VA, to the benefit of Cook Medical. [Dkt. #166, Tr. Ex. 15 at Art. IX, ¶ 3.] Cook Medical obtained no advantage in being deprived of the benefit of the Distribution Agreement. Notwithstanding Acheron's representations to the contrary, there were no "facts elicited at trial" indicating that Cook Medical declined to participate in the OIG audit as a means to cut Acheron out as the middle man and avoid paying commissions. In fact, the trial transcript shows that Acheron's counsel posited this theory during his cross-examination of Walters, and Walters unequivocally denied that was Cook Medical's goal or reasoning. [Dkt. #158, Trial Tr. at p. 171-78.] Acheron's argumentative questioning was not evidence and was not adopted by the District Court in is order following the bench trial. [*See generally*, APPX-1 to APPX-7.]

23

### 3. Government regulations applicable to Acheron do not imply a duty by Cook Medical.

In the absence of a contractual obligation for Cook Medical to submit to the commercial pricing audit, Acheron also turns to federal law to imply this obligation upon Cook Medical. In the first instance, Acheron refers to C.F.R. § 515.408(b)(5). As Acheron recognizes, that regulation provides that "when a reseller represents a manufacturer's products, does not have significant sales to the general public, and the sales under the resulting FSS contract are expected to exceed $500,000" (as was the case here, "then it [meaning the reseller], must obtain 'written authorization from the manufacturer(s) for Government access, at any time before the award . . . to the manufacturer's sales records for the purposes of verifying the information submitted by the manufacturer.'" [Appellant's Br. at 43, *quoting* C.F.R. § 515.408(b)(5). Considering this language on summary judgment, the District Court correctly held the regulation "did not govern the relationship between Acheron and Cook Medical, but rather Acheron's relationship [as the proposed reseller] with the VA," and did not impose any obligation on Cook Medical to provide its sales information. [Dkt. #91, at p. 17.]

Acheron argues that it did obtain a written authorization from Cook Medical in accordance with the applicable regulation, but the evidence shows otherwise.

Within weeks of Walters expressing concerns about any inquiry into Cook Medical's commercial pricing, Pate received an email from the contracting officer asking for an authorization letter, signed by an officer of Cook Medical, granting access to all commercial pricing information to support the FSS award. [Dkt.

26023419.3

#166, Tr. Ex. 20] Pate did not forward that email to Walters, let alone to the General Counsel at Cook Medical as required by the Distribution Agreement. [Dkt. #166, Tr. Ex. 15 at Art. X, ¶ 5.] Instead, Pate fashioned a vague letter about providing access to information and sent it only to Walters, not an officer of Cook Medical, for signature. If Pate had forwarded the request or specified that the VA was seeking access to all commercial pricing, this would have alerted Cook Medical that the approach Acheron had proposed for FSS pricing was not workable.

Moreover, in light of the regulation, Acheron could have, and should have, negotiated a provision in the integrated written agreement requiring Cook Medical to provide all commercial pricing information to support the FSS award. Acheron did not appropriately undertake its responsibilities under the regulations as the reseller and wants a court to imply those conditions after the fact on Cook Medical.

Finally, Acheron references the "Christian Doctrine," arising from the case of *G.L. Christian & Assocs. v. U.S.*, 312 F.2d 481 (Ct. Cl. 1963) which provides that courts will "read into a federal procurement contract" certain administrative regulations. [Appellant's Br. at p. 42.] As shown above, the regulation at issue puts a burden on Acheron, which Acheron did not fulfill, and does not imply a duty by Cook Medical. Further, the Distribution Agreement is between Acheron and Cook Medical. The United States government is not a party to this suit; nor is the DOD or the VA. Even *UPMC Braddock v. Perez*, 584 Fed. Appx. 1 (D.C. Cir. 2014) This is a dispute between private sector parties as to their respective

25

contract obligations, making the *Christian* doctrine inapposite. If Acheron had an obligation to obtain Cook Medical's participation in the OIG audit to obtain the FSS, then it could have, and should have, been transparent about that obligation and obtained true and informed authorization from Cook Medical. Acheron did not do so.

### 4. The prevention doctrine does not apply because Cook Medical did not "wrongfully" refuse to comply with the OIG audit.

Acheron's reliance on Indiana law that "excuses performance of one party where the other party *wrongfully* prevents that performance," is inapposite because Cook Medical was not required to undergo the OIG audit under the terms of the Distribution Agreement. [Appellant's Br., App. Dkt. #13, at p. 34, quoting *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 620 (Ind. Ct. App. 2000).] Initially, the District Court appropriately questioned whether Acheron obtaining the FSS was a "condition precedent" under principles of Indiana law that require that such conditions be explicitly stated. [Dkt. #91, at p. 13, quoting *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 840 (Ind. Ct. App. 2015), *trans. Denied*, 45 N.E.3d 1211 (Ind. 2016).] Nevertheless, if Acheron obtaining an FSS was a condition precedent, as it must be for the prevention doctrine to apply, Cook Medical did not act wrongfully in refusing to undergo an OIG audit not included in the Distribution Agreement.

Once again, Acheron fails to cite a single Indiana case that applies the prevention doctrine to add terms to a contract. Applying the Restatement (Second) of Contracts, § 245, the Indiana Court of Appeals, in *L.B. Foster Co. v.*

26

*Tie & Track Sys.*, Case No. 07 C 3692, 2009 U.S. Dist. LEXIS 26962, at * 17 (N.D. Ill. Mar. 31, 2009), refused to impose a duty outside of the agreement on a contracting party. The Court explained, that Section 245 "illustrate[s] situations where a party's failure to honor its duties to effect a contractual condition excuses the performance of that condition. L.B. Foster has not explained why Tie & Track's statement that the payment and terms were 'to be agreed' imposed upon Tie & Track a duty to affect a contractual condition." *Id.*; *see also Nat'l Labor Relations Bd. v. Local 554*, ("The Restatement (Second) of Contracts § 245 (1979), discusses the circumstances by which a party's *purposeful non-performance of a contractual condition* excuses its performance. (emphasis added)). In other words, Section 245 of the Restatement requires first and foremost a contractual obligation, which is lacking here.

**5. Indiana liberally construes the "election of remedies" doctrine to allow parties to pursue alternative remedies to a conclusion.**

Acheron incorrectly asserts that the election of remedies doctrine barred Cook Medical from terminating the Distribution Agreement. Under Indiana law, the election of remedies doctrine rather liberally allows a party to pursue inconsistent remedies to and including trial so long as the party does not pursue them in separate litigations. "The election of remedies doctrine requires that a party who has two co-existing but inconsistent remedies and elects to pursue one remedy to a conclusion may not sue on the other remedy." *Cahoon v. Cummings,* 734 N.E.2d 535, 542 (Ind. 2000), citing *Hoover v. Hearth & Home Design Ctr., Inc.,* 654 N.E.2d 744, 745 (Ind. 1995). "The doctrine ordinarily

27

applies only when a party has elected to pursue one remedy to its conclusion and then attempts to pursue a subsequent claim on a second inconsistent theory." *See id.*, citing *Parke v. First Nat'l Bank*, 571 N.E.2d 1317, 1319 (Ind. Ct. App. 1991).

Contrary to the holdings in these Indiana cases, Acheron contends that Cook Medical elected a remedy when, despite Acheron's failure to obtain the FSS, Walters tried to find a way to continue to work with Pate and Lauch because he liked them and wanted to find a way for them to succeed. With no Indiana case law support, Acheron suggests that trying to find a way to work with someone rather than immediately bringing suit constitutes a waiver of the breach for all time. There is simply no case law to support such a position, and the District Court was correct in finding that Cook Medical did was not barred from terminating the contract when the parties' relationship became unworkable after the breach.

Nor do the principals of waiver, estoppel and modification apply in this case. Walters' desire to find a way to work with Acheron to its benefit cannot constitute a waiver where the written Distribution Agreement required any modification to be made in writing and executed by the parties. [Tr. Ex. 15, at Art. X, ¶ 2 ("[n]o amendment, modification, or addition to this Agreement shall be binding on the parties unless reduced to writing and duly executed by [Cook] and [Acheron].")] As the District Court held, "while Walters may have wanted to salvage some sort of relationship between the two parties, and while he might have believed that relationship could be governed by the Agreement, it could

28

26023419.3

not." [Dkt. #91, at p. 20.] Simply put, Walters alone did not have authority to modify the parties' agreement or to waive Acheron's breach. A modification or waiver of Acheron's obligation to obtain the FSS required a written and duly executed amendment to the Distribution Agreement, which did not occur.

### B. Cook Medical did not breach the Distribution Agreement by continuing to make sales under its own DAPA.

Acheron further seeks to rewrite the Distribution Agreement to assert that Cook Medical was required to halt its direct sales to the DOD and disable its DAPA in favor of allowing Acheron to make those sales. Once again, no such obligation is recited in the parties' integrated written agreement. To the contrary, the Distribution Agreement expressly contemplates direct sales by Cook Medical to the DOD and VA. For example, during the time that Acheron was pursuing the FSS, the Distribution Agreement required Cook Medical to pay Acheron a commission to Acheron on Cook Medical's direct sales to the DOD and VA. [Dkt. #166, Tr. Ex. 15, at Art. V, ¶ 3.] Further, Exhibit A to the Distribution Agreement provides that Cook Medical will continue to pay a three percent commission to Acheron for Cook Medical's direct sales to the DOD and VA, but that an FSS must be in place for such payments to be made. [Dkt. #166, Tr. Ex. 15 at its Ex. A.]

Acheron wants to disregard the fact that they obtained and retained almost $120,000 for Cook Medical's direct sales of endoscopy products due to Cook Medical continuing to make such sales during the failed application process. Further, Acheron mischaracterizes Walters' trial testimony which makes clear

29

that the customer retained the right to purchase through the prime vendor or Cook Medical directly. [Trial Tr. at 226-27.]

Finally, Acheron originally asserted that if Cook Medical had allowed Acheron to make sales of Cook Medical's products to the DOD through its own DAPA the OIG audit would not have been required. [Dkt. 1 at ¶ 28.] However, the applicable regulations provide that a reseller without substantial commercial sales or sales to the general public will be required to submit to the audit when the projected contract sales exceed $500,000, so government sales to the DOD would have been irrelevant.

## II. The District Court erred in holding that Acheron was excused from liability for its breach of contract.

The Distribution Agreement refers to Acheron's obligation to obtain the FSS in several of its provisions. In addition to clearly stating that Acheron "will obtain a Federal Supply Schedule contract and use it to sell [Cook Medical's] products," the Distribution Agreement contains multiple additional references to the FSS. [*See* Dkt. #166, Tr. Ex. 15, at Art. II, ¶¶ 2, 3, Art. IV, Art. IX ¶ 2 and its Exhibit A.] Although Acheron contends that other factors such as potential for small business set-aside and a potential veteran-owned business affiliation were relevant to the business relationship between Acheron and Cook Medical, the Distribution Agreement does not mention these factors or establish rights or obligations related to such factors. [*See generally* Dkt. #166, Tr. Ex. 15.] Further, Walters testified that the FSS was the primary focus of the conversations and relationship with Acheron. [Dkt. #158, Trial Tr. at p.24.]

26023419.3

After considering the evidence at trial, the District Court found that Walters' testimony "as a whole and, most importantly, the Agreement itself" proves that the FSS was a material obligation of the Distribution Agreement. [APPX-3 n.3.] It is undisputed that Acheron failed to fulfill this obligation. Further, the parties stipulated that Cook Medical paid Acheron $116,317.81 pursuant to a provision in the Distribution Agreement that called for Cook Medical to make such payments "provided" Acheron obtained the FSS by December 31, 2014. It is undisputed that Acheron did not obtain the FSS by December 31, 2014, or thereafter.

**A. The *force majeure* clause did not relieve Acheron from liability for its breach.**

On summary judgment, Acheron suggested that the *force majeure* clause required Cook Medical, as a party "affected" by the OIG audit, to undertake the audit to remove the impediment to Acheron's performance in obtaining the FSS. Later, on the counterclaim, Acheron asserted the *force majeure* clause to assert that its own performance of obtaining the FSS was excused by the act of government or agency in requiring the commercial pricing audit.

The Court must consider the force majeure clause, "in accordance with its language and context." [Dkt. #91, at p. 11, quoting *Wisconsin Elec. Power Co. v. Union Pac. R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009). In so doing, the Court considers the nature of the agreement, facts and circumstances leading up to its execution, the purposes for entering the contract and more. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). The Court would have to

31

read the contract as a whole and construe it so as not to render any words, phrases or terms ineffective or meaningless. *State Farm Fire & Cas. Co. v. Riddell Nat'l Bank*, 984 N.E.2d 655, 658 (Ind. Ct. App. 2013), *trans. denied.*

Black's Law Dictionary defines a "force majeure" as "[a]n event or effect that can be neither anticipated nor controlled," and "an unexpected event that prevents someone from doing or completing something that he or she had agreed or officially planned to do." BLACK'S LAW DICTIONARY (10th ed. 2014). The clause is not written to excuse performance in the event of <u>any</u> government act. It must be a force majeure – a government act that "can be neither anticipated nor controlled," or a government act that is "unexpected."

The District Court found that the OIG audit request was a *force majeure* because Walters was "shocked" when he received the audit request letter. [APPX-5.] But, Acheron, the party seeking to avail itself of the *force majeure* defense was not shocked by the audit request. Acheron, with its 30 years of government contracting experience has contended throughout this case that Cook Medical should have known that the OIG audit would be requested based on newsletters, internet research and regulations. Pate even claimed that he asked Cook Medical to authorize the commercial pricing audit (which he did not), and that he told Walters that an audit would be required (again, a falsity). Neither the District Court's opinion nor anything Acheron cites supports a finding that a one-sided surprise can support a finding that a requirement is a *force majeure*, that can "neither be anticipated nor controlled."

32

26023419.3

**B. Cook Medical was entitled to recoup its prepayments to Acheron as damages.**

"It is axiomatic that a party injured by breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered. A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 947 N.E.2d 1031, 1043 (Ind. Ct. App. 2012), *quoting Fowler v. Campbell*, 612 N.E.2d, 596, 603 (Ind. Ct. App. 1993)(internal citations omitted). Arguably, Cook Medial has been damaged in an amount equal to the loss of the benefit of its bargain – i.e., the loss of increased sales of its products to the DOD and VA as Acheron promised under the Distribution Agreement. However, given the many unknowns – including pricing, volume, cost of sales and the potential for off-contract purchases by the VA and the DOD – the actual amount of Cook Medical's lost sales and lost profits resulting from Acheron's breach of the Distribution Agreement in failing to obtain the FSS as promised is too speculative to support an award of these benefit-of-the-bargain damages. Acheron initiated this lawsuit seeking millions of dollars in alleged lost profit based on its contractual claim to 3 percent and 8 percent commissions. Cook Medical would have received 97 percent or 92 percent of those same projected sales. Based on Acheron's projections, Cook Medical was deprived of the benefit of a bargain that

33

Acheron projected would increase Cook Medical's government sales of endoscopy and potentially other products by at least 12 percent per year. However, just as Acheron's claimed damages were speculative under these circumstances, so, too, are Cook Medical's increased profits. This was the basis of Cook Medical's decision to forego a claim for such damages.

By contrast, the $116,317.81 that Cook Medical actually paid to Acheron as an "incentive" or subsidy to obtain the FSS as promised, is a direct and measurable damage to Cook Medical resulting from Acheron's breach. Contrary to Acheron's assertions, the refund of these amounts paid pursuant to a Distribution Agreement provision that called for the commission to be paid "provided" that Acheron obtained the FSS by the end of calendar year 2014 is *not* a windfall to Cook Medical. In fact, the $116,317.81 damage award could never make Cook Medical whole for all that it had invested in this relationship in terms of travel, personnel hours and other expenses.

In the District Court, Acheron relied on a "body of case law finding payments by a principal to an agent tied to incentives as not creating an indebtedness if the goal is not reached absent a promise to repay set forth in the agreement under which the payments were made." [Dkt. #114, at p. 11-12] This precedent is inapposite. The 1904 case *Arbaugh v. Shockney*, 34 Ind. App. 268, 72 NE 668 (1904) and 32 A.L.R. 3d 802, "collecting cases" as to the personal liability of a servant or agent, are not controlling in this case. Acheron and Cook Medical were parties to a contract, dealing at arms length, who expressly disclaimed the existence of a principal-agent relationship in their contract. [*See*

26023419.3

Dkt. #166, Tr. Ex. 15, Art., ¶ 8 (Acheron "acknowledges that it is an independent contractor and this Agreement shall not constitute appointment of [Acheron] as an agent of COOK or any Affiliate for any purpose.)]

The District Court found that the "provided" language was ambiguous and that the payments were made as "consideration for the fact that Acheron had incurred expenses prior to the execution of the Agreement and would continue to incur expenses related to working with Cook . . . " [APPX-6.]  However, the "provided" language is *not* ambiguous. Other evidence showed that Cook Medical also incurred substantial costs in its efforts to help Acheron obtain the FSS. [Dkt. #158, Trial Tr. at p. 47 – 48.] Further, a party that pays consideration with the expectation that a condition will be fulfilled is routinely granted the return of such consideration when the other party fails to fulfill its obligations under the contract.  This is the kind of quantifiable and certain damage claim recognized by *L.H. Controls* under Indiana law.

For these reasons, Cook Medical should have been awarded damages in the amount of $116,317.81 on its counterclaim against Acheron.

## CONCLUSION

For the reasons shown above, the Court should affirm the entry of summary judgment against Acheron and in favor of Cook Medical.  Also, for the reasons shown above, the Court should reverse the Court's holding on Cook Medical's counterclaim and remand for entry of an award of damages.

35

Respectfully submitted,

*/s/Anne L. Cowgur*
Anne L. Cowgur, Counsel of Record
Tammara D. Porter
Taft Stettinius & Hollister LLP

Attorneys for Defendants-Appellees/
Cross-Appellants,
Cook Medical Incorporated and Cook
Medical LLC

## Certificate of Compliance

This Defendants-Appellees/Cross Appellants' Brief complies with the word limit of Circuit Rule 32(c) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this Brief contains 11,637 words.

This Appellee's Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this Brief has been prepared in proportionally spaced typeface using Word version 10 in 12-point Bookman Old Style font.

*/s/ Anne L. Cowgur*
Anne L. Cowgur
Attorney for Defendants-Appellees/Cross-Appellants,
Cook Medical Incorporated and Cook Medical LLC
October 16, 2019

36

**Circuit Rule 30(d) Statement**

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

*/s/ Anne L. Cowgur*
Anne L. Cowgur

**Certificate of Service**

I certify that on October 22, 2019, I electronically filed this Defendants-Appellees'/Cross-Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Anne L. Cowgur*
Anne L. Cowgur
Attorney for Defendants-Appellees'/Cross-Appellants,
Cook Medical Incorporated and Cook Medical LLC

37

26023419.3

# APPENDIX

26023419.3

**TABLE OF CONTENTS TO APPENDIX**

Findings of Fact and Conclusions of Law Following
    Bench Trial, Dkt. #148 filed June 24, 2019 ...........................................................Appx-1

26023419.3

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| ACHERON MEDICAL SUPPLY, LLC, | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
|     vs. | ) **Cause No. 1:15-cv-1510-WTL-MPB** |
| | ) |
| COOK INCORPORATED, et al., | ) |
| | ) |
|   Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

A bench trial was held in this case before the undersigned beginning on April 23, 2019, on the counterclaim of Cook Medical LLC ("Cook").[1]  The Court, having considered the evidence submitted at trial, as well as the parties' post-trial submissions, hereby makes the following findings of fact and conclusions of law.

In July 2014, Cook and Counterclaim Defendant Acheron Medical Supply, LLC, ("Acheron") entered into a five-year Distribution Agreement (the "Agreement").  Pursuant to the terms of the Agreement, Acheron was to serve as a distributor (or reseller) of certain of Cook's medical devices and products to the Department of Defense Medical Centers ("DOD") and the Veterans Administration ("VA").  Specifically, the Agreement stated that Acheron was appointed as Cook's exclusive distributor to the DOD and VA for the products and devices of Cook's Endoscopy business unit and a non-exclusive distributor for the products of its other business units.  Acheron, which had been formed in July 2013, qualified as a small business for purposes of certain government set-asides, whereas Cook did not; therefore, by utilizing Acheron

---

[1]Acheron's claims against Cook were resolved in favor of Cook at the summary judgment stage.

as a distributor, Cook could make more sales to the VA and DOD than it could by selling to them directly.

The Agreement provides that "[Acheron] will obtain a Federal Supply Schedule contract and use it to sell the Products."  A Federal Supply Schedule contract ("FSS") is one type of Multi-Award Schedule contract that the VA enters into with suppliers covering the sale of goods and services to the VA; the Agreement also contemplates that sales would be made under various other types of government contract vehicles.  The Agreement further provides that

> Cook will pay [Acheron] a commission of 3 percent (3%) of the purchase price on all Endoscopy Products sold by [Cook] in the Territory between March 1, 2014 and the date [Acheron] obtains its Federal Supply Schedule contract, provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year. After the date [Acheron] obtains its Federal Supply Schedule contract Cook will pay [Acheron] a commission on Products that are approved on its Federal Supply Schule contract at the time of the sale, in accordance with the applicable rate (depending on selling party, method of sale, etc.) as set forth in the commission schedule attached to this Agreement as Exhibit A.

The parties stipulate that Cook paid Acheron commissions in the amount of $116,317.81 pursuant to this provision, which was based upon sales made by Cook to the VA and DOD between March 1, 2014, and December 31, 2014.

It is undisputed that Acheron did not obtain an FSS.  It is also undisputed that Acheron was unable to obtain an FSS because the VA's Office of Inspector General ("OIG") would not award an FSS to Acheron unless Cook underwent an OIG audit.  The OIG audit of Cook was required by the VA because Acheron was a new company that did not have a record of significant sales to the public; therefore, in order to determine whether Acheron's proposed pricing of Cook's products was fair and reasonable, the VA needed to review Cook's commercial sales records.  Cook had not anticipated that it would have to provide the extensive information required by the VA in order for Acheron to obtain an FSS; in fact, Ron Walters

testified that he was shocked to learn that it was being requested.  Cook ultimately refused to undertake the burden of the OIG audit.  After it was apparent that Acheron would be unable to obtain an FSS audit, Cook attempted to salvage a relationship with Acheron—after all, there were other means by which sales could be made to the VA besides an FSS—but ultimately decided to exercise its right to terminate the contract pursuant to the following provision in the Agreement:

> Cook may terminate this Agreement effective immediately upon written notice to [Acheron] of the occurrence of a material breach by [Acheron] of any of its essential contractual obligations contained in this Agreement, which is not cured by [Acheron] within thirty (30) days after receiving written notice of the breach from Cook.

In its counterclaim, Cook asserts a breach of contract claim against Acheron based upon Acheron's failure to obtain an FSS.  Cook asserts that it is entitled to a return of the $116,317.81 it paid to Acheron pursuant to the Agreement as damages for the breach.[2]

The Court finds that Acheron's admitted inability to obtain an FSS was a material breach of the Agreement.[3]  However, the Court finds that Acheron was excused from this breach by the force majeure clause in the Agreement.

---

[2]Cook acknowledges that its actual damages from the breach are the loss of its profits from the increased sales of its products to the DOD and the VA contemplated by the Agreement, but concedes that the amount of those lost profits is too speculative to form the basis of a damages award.

[3]Acheron points to testimony from Ron Walters from trial that it argues demonstrates that obtaining an FSS was not an essential requirement of the Agreement.  However, the evidence as a whole, including Walters' testimony as a whole and, most importantly, the Agreement itself— proves the contrary.   The (undisputed) fact that an FSS was not the only means of making sales to the VA—which is all that the testimony pointed to by Acheron expresses—does not render Acheron's obligation to obtain an FSS nonessential.  Rather, the evidence as a whole demonstrates that obtaining an FSS would have provided additional benefits to Cook, and those benefits were an essential part of its bargain with Acheron.

"A force majeure clause is defined as a 'contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled.'" *Specialty Foods of Indiana, Inc. v. City of S. Bend*, 997 N.E.2d 23, 26 (Ind. Ct. App. 2013) (quoting *Black's Law Dictionary* 674 (8th ed. 2004)).  However,

> the scope and effect of a force majeure clause depends on the specific contract language, and not on any traditional definition of the term.  In other words, when the parties have defined the nature of force majeure in their agreement, that nature dictates the application, effect, and scope of force majeure with regard to that agreement and those parties, and reviewing courts are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended.  The party seeking to excuse its performance under a force majeure clause bears the burden of proof of establishing that defense.

*Id.* at 27 (citations and internal quotation marks omitted).

> The force majeure provision in the Agreement provides:

> Neither COOK nor any Affiliate nor [Acheron] shall be liable for any delay or default caused by force majeure, including, without limitation . . . act of government or . . . agency . . . .  The party affected by such a condition shall use every reasonable effort to correct or eliminate the cause which prevents performance and resume performance as soon as possible.

It is undisputed that Acheron was unable to obtain an FSS because the VA—a government agency—required information from Cook that Cook was unwilling to provide.  Thus, it was an act of a government agency—the insistence that Cook submit to an OIG audit—that caused Acheron to breach the agreement.  By the plain language of the Agreement, Acheron is not liable for that breach.

> Cook argues that

> Black's Law Dictionary defines as "[a]n event or effect that can be neither anticipated nor controlled," and "an unexpected event that prevents someone from doing or completing something that he or she had agreed or officially planned to do."  BLACK'S LAW DICTIONARY (10th ed. 2014).  The clause is not written to excuse performance in the event of any government act.  It must be a force

4

majeure – a government act that "can be neither anticipated nor controlled," or a government act that is "unexpected."

The Distribution Agreement's sole focus was an arrangement for contracting with and making sales to the United States government. If the government triggers the operation of the force majeure clause simply by sending a request for an audit then Acheron's obligations to obtain an FSS contract become illusory as do other obligations under the Distribution Agreement. Under Acheron's interpretation, no matter what the government's reasoning for denying an FSS application, Acheron should be excused from this material obligation. If the government buys less than anticipated, Acheron should be excused of the defined sales goals. Such an interpretation would render Acheron's performance obligations under the contract illusory meaningless, and the contract thereby unenforceable.

Dkt. No. 141-1 at 14-15. The Court rejects this argument. The evidence establishes that the OIG audit requirement—specifically, the extent of information that Cook would be required to provide to the government—*was* unanticipated by the parties; indeed, as noted above, Walters was shocked by it. It is undisputed that the parties had no control over it; all agree that there was no way for Acheron to obtain the FSS without the audit. Applying the force majeure clause to this situation does not render Acheron's obligation to obtain an FSS illusory; it simply recognizes that the Agreement did not require Acheron (or Cook) to fulfill an obligation that was rendered impossible by an unanticipated event out of its control.

The Court further finds that even if Acheron's breach was not excused by the force majeure clause, Cook would not be entitled to the damages it seeks—a return of the payments it made under the Agreement. Cook asserts that those payments were "conditioned on Acheron obtaining an FSS contract by the end of calendar year 2014." Dkt. No. 141-1 at 10. The Court finds that the relevant contract provision is ambiguous on this point. The Agreement provides that the payments are to be made "provided such Federal Supply Schedule is obtained by the end of the 2014 calendar year." This could be read as making the payments conditional, but it also could be read as simply ending Cook's obligation to make the payments as of December 31,

5

2014, or when an FSS was obtained, whichever came sooner. The evidence compels the conclusion that the parties intended the latter. If the commissions were only payable if an FSS were obtained by the end of 2014, then either they would not have been made until an FSS was obtained or the Agreement would have provided for their repayment if an FSS was not obtained by that date. But they were made on an ongoing basis, there is no such repayment provision, and, consistent with Walters' testimony about his understanding of the provision, Cook did not ask for repayment when 2014 ended without an FSS in place.

Cook also argues that the payments constitute an appropriate measure of damages for Acheron's breach. As Cook correctly recognizes, "the measure of damages in a breach of contract case is the loss actually suffered by the breach." Dkt. No. 141-1 at 11 (citing *Dana Companies, LLC v. Chaffee Rentals*, 1 N.E. 738, 748 (Ind. Ct. App. 2013)).

> It is axiomatic that a party injured by breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered. A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances.

*L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). Walters testified that the provision was added to the Agreement, and the payments were made by Cook, as consideration for the fact that Acheron had incurred expenses prior to the execution of the Agreement and would continue to incur expenses related to working with Cook and the government to establish the FSS and other contract vehicles to enable it to make sales of Cook's products to the VA and the DOD. Thus, those payments do not constitute a loss suffered by Cook as a result of the breach. Acheron performed the work and incurred the expenses for which those payments were compensation. And while the fact that that work did not ultimately obtain

6

the result contemplated by the Agreement—an FSS—may have caused Cook damages, Cook concedes that it may not recover those damages because they are too speculative, and Cook has not cited to any authority for the proposition that it may substitute as damages the payments it made to Acheron that were not made as consideration for obtaining an FSS, but rather as consideration for preliminary work performed by Acheron.

For the reasons set forth above, the Court finds that Acheron's inability to obtain an FSS constitutes a material breach of the Agreement, but that, by operation of the force majeure clause in the Agreement, Acheron is not liable to Cook for that breach. Alternatively, the Court finds that even if the force majeure clause did not apply, Cook would not be entitled to repayment of the commissions it paid to Acheron under the Agreement. Accordingly, the Court finds in favor of Acheron and against Cook on Cook's counterclaim.

SO ORDERED: 6/24/2019

_William T. Lawrence_
Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

7

APPX-7